UNITED STATES of America,

v.

Gaetano VASTOLA, a/k/a "Tommy," a/k/a "Corky," a/k/a "The Galoot," a/k/a "The Big Guy," Palmer Brocco, a/k/a "Sonny," Nicholas John Massaro, Jr., Rudolph Farone, Larry Martire, Elias Saka, a/k/a "Lew," Benjamin Stone, George Santoni, Thomas Zito, a/k/a "Mr. Gordon," a/k/a "Tommy Russo," Charles Majuri, Dominick Canterino, Morris Levy, Howard Fisher, Alexander D'Alessio, Sr., a/k/a "Pope," Alexander D'Alessio, Jr., a/k/a "Popie," John Brennan, a/k/a "Jack," Barry Harris, Bruce Howard, Daniel Marino, Paul Sanzaro, and Vincent Uris, a/k/a "Butch", Defendants.

Crim. A. No. 86–301(SSB).

United States District Court,
D. New Jersey.

Sept. 1, 1987.

Office of the U.S. Atty. by Bruce Repetto, Andrew T. Baxter, Asst. U.S. Attys., Newark, N.J., for U.S.

Michael Rosen, New York City, for defendant Vastola.

Ryan, Pedicini & Donnelly by Rita Donnelly, West Orange, N.J., for defendant Brocco.

Joshua Markowitz, Lawrenceville, N.J., for defendant Massaro.

DeCotiis, Frino & Lundstein by William R. Lundstein, Roseland, N.J., for defendant Farone.

Cathy Waldor, Montclair, N.J., for defendant Martire.

Lyle Hough, Trenton, N.J., for defendant Saka.

Office of the Federal Public Defender by Richard Coughlin, Asst. Federal Public Defender, Camden, N.J., for defendant Stone.

Tomar, Seliger, Simonoff, Adourian & O'Brien by Charles N. Riley, Haddonfield, N.J., for defendant Santoni.

Barry Schulman, Brooklyn, N.Y., for defendant Zito.

Raymond R. Beam, Jr., Bloomfield, N.J., for defendant Majuri.

Michael B. Pollack, New York City, for defendant Canterino.

Michael Querques, Orange, N.J., for defendant Levy.

Leon Borstein, New York City, for defendant Fisher.

Cariddi & Garcia by Anthony Cariddi, Hackensack, N.J., for defendant D'Alessio, Sr.

Louis Sette, Ridgewood, N.J., for defendant D'Alessio, Jr.

David L. Rhodes, Lawrenceville, N.J., for defendant Brennan.

Jack Urscheler, Fort Lee, N.J., for defendant Harris.

Robert A. Farkas, Trenton, N.J., for defendant Howard.

Brown & Connery by William M. Tambussi, Westmont, N.J., for defendant Marino.

Ken Lange, Bay Harbor, Fla., for defendant Sanzaro.

Julian DeAngeli, Lawrenceville, N.J., for defendant Uris.

## TABLE OF CONTENTS

I. INTRODUCTION

II. MOTIONS TO DISMISS, TO STRIKE AND TO FORCE THE GOVERNMENT TO ELECT BETWEEN CHARGED OFFENSES AND COUNTS

 A. Defendants' Joint Motion to Dismiss Counts 1 and 3; or in the Alternative to Dismiss Acts 1, 17, 18, and Count 1, ¶ 5 Because Multiple Conspiracies are Plead as Predicate Acts

 B. Defendants' Joint Motion to Compel the Government to Elect Between the Two Substantive RICO Counts (1 and 2)

II. MOTIONS TO DISMISS, TO STRIKE AND TO FORCE THE GOVERN-MENT TO ELECT BETWEEN CHARGED OFFENSES AND COUNTS—Continued

 C. Defendants' Joint Motion to Strike Surplusage from the Indictment

 (1) The Preamble

 (2) "Racketeering" and "Loansharking"

 (3) Aliases

 (4) "[A]nd with others" and "and others" and "and other criminal means."

 D. Defendant Farone's Motion to Dismiss Counts 1 and 3

 E. Defendants' (Levy and Fisher) Motion to Dismiss Counts 33 or 34 as Duplicitous or in the Alternative to Force the Government to Elect Between Charges Alleged

 F. Defendant Harris' Motion to Dismiss Counts 41, 48, and 75, as Insufficient Pleadings and For a Bill of Particulars

 G. Defendant Majuri's Motion to Dismiss Counts 3 and 98

III. MOTIONS TO SEVER

 A. The Severance Plan

 1. The RICO Trial

 a. Case Management

 b. Firearms Charges

 i. Title 18 U.S.C. App. § 1202

 ii. Title 26 U.S.C. § 5861

 2. Majuri Firearms Trial

 3. Other Individual RICO Defendants' Motions to Sever

 a. Majuri

 b. Stone

 4. Non-RICO Defendants' Motions to Sever

 5. Order of Trials and Continuance Motion

IV. MOTIONS FOR PRETRIAL HEARINGS AND DISCOVERY

 A. Defendants' (Levy and Fisher) Motion for *Brady* Material

 B. Defendants' Joint Motion For Pretrial Proffer of a Single Conspiracy

 C. Defendants' Joint Motion for a *James* Hearing

 D. Defendants' Joint Motion for Pre-trial Hearings on Evidentiary Material (Prior Conduct, Prior Convictions, Bad Acts)

 E. Defendants' Joint Motion for Pretrial Discovery (Witness List, Statements of Non-Testifying Witnesses, Grand Jury Information)

 F. Defendants' Joint Motion for a Bill of Particulars

V. MOTIONS TO SUPPRESS

 A. Individual Defendants' Motions To Suppress Fruits of Searches

 1. Vastola Motion

 a. Fruits of Wire and Mail Fraud

 b. Fruits of Extortion

 2. Saka Motion

 3. Majuri Motion

 4. Brocco Motion

V. MOTIONS TO SUPPRESS—Continued

 B. Defendants' Joint Motion To Suppress Electronic Surveillance

 1. The Government's Electronic Surveillance Did Not Constitute a General Search

 2. Probable Cause and the New Jersey Surveillances

 a. The November 28, 1984 Surveillance at the Massaro Residence

 b. The December 5, 1984 Amendment, and the December 14 and 24 Extensions of the Massaro Surveillance

 c. The Union County Prosecutor's Video Warehouse Electronic Surveillance Order, Amendment, and Extensions

 d. The New Surveillance at Video Warehouse, Amendment and Extensions

 e. The Brocco Residence Surveillance

 f. The Killeen and Majuri Residences Surveillance

 g. The March 14, 1985 Federal Video Warehouse Surveillance

 h. The April 16 Video Warehouse Order

 i. The May 14 Video Warehouse Order

 j. The June 26 Video Warehouse Order

 k. The July 25 Video Warehouse Order

 3. Defendants' Request For a *Franks* Hearing

 4. Failure to Exhaust Ordinary Investigative Means

 5. Delay in Sealing the Fruits of the March 25, 1985 Video Warehouse Order

 6. The Maryland Surveillance Orders

 a. The March 19 Surveillance Order

 b. The April 23, 1985 Extension of the Maryland Surveillance

 7. New York Federal Surveillance

 8. Defendants' Request for Orders and Applications for Surveillances at the Olympia Esposito Residence, the Smith Street Democratic Club, and Manhattan Social Clubs

 a. The Olympia Esposito Residence 10-day Reports

 b. The Democratic Club Applications and Orders

 c. The Manhattan Social Clubs Applications and Orders

---

## OPINION

BROTMAN, District Judge:

## I. INTRODUCTION

Presently before the court are a voluminous set of pretrial motions. Oral argument was heard on the *Brady* motion of defendants Levy and Fisher on June 12, 1987, and the remainder of the motions were argued on July 10, 1987. This case is based on a 114–count indictment naming 21 defendants. Ten defendants are named in counts alleging violations of the Racketeering Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Count 1 alleges a § 1962(c) violation based on a "pattern of racketeering activity." Count 2 alleges a § 1962(c) violation based on "collection of unlawful debt." These two counts are referred to throughout the opin-

ion as substantive RICO counts. Count 3 alleges a § 1962(d) violation based on a RICO conspiracy. This count is referred to as the RICO conspiracy count. The remaining counts fall into the following categories of criminal activity: narcotics, usury and extortion, mail ("bust-out") fraud, wire ("Western Union") fraud, copyright (video "bootlegging") fraud, insurance fraud, bankruptcy fraud, gambling, and firearms.

The pretrial motions are grouped into categories and discussed in parts II–V of this opinion: Part II, motions to dismiss, to strike, and to force the government to elect between charged offenses and counts; Part III, motions to sever; Part IV, motions for pretrial hearings and discovery; and Part V, motions to suppress. The order follows the opinion.

## II. MOTIONS TO DISMISS, TO STRIKE AND TO FORCE THE GOVERNMENT TO ELECT BETWEEN CHARGED OFFENSES AND COUNTS

### A. Defendants' Joint Motion to Dismiss Counts 1 and 3; or in the Alternative to Dismiss Acts 1, 17, 18, and Count 1, ¶ 5 Because Multiple Conspiracies are Plead as Predicate Acts

■ Defendants move to dismiss counts 1 and 3 because they include conspiratorial acts as predicate offenses. This is allowed by the plain language of the statute. 18 U.S.C. § 1961(1). The government cites second circuit law endorsing this practice. *See United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Santoro*, 647 F.Supp. 153, 177–78 (E.D.N.Y.1986). It appears that the Third Circuit Court of Appeals has not directly faced the question. The defense asserts that third circuit law, under *Gomberg*, requires that such pleading not be allowed. *See United States v. Gomberg*, 715 F.2d 843 (3d Cir.1983). However, *Gomberg* is not squarely on point. It addresses a duplicity question and holds that a single conspiracy count can allege multiple crimes. 715 F.2d at 846. The alleged

RICO conspiracy (count 3) has multiple objects contained in the pattern of racketeering and the collection of unlawful debt. At trial the government will have to prove beyond a reasonable doubt that there existed a unified agreement to participate in the affairs of the "Vastola enterprise" through a pattern of racketeering or through the collection of unlawful debt. *See United States v. Boffa*, 513 F.Supp. 444, 475 (D.Del.1980). The multiple conspiracy doctrine requires that all RICO enterprise defendants be shown to have a nexus "which signals the existence of a truly unified agreement." *Id.* at 474; *see also United States v. Smith*, 789 F.2d 196, 200 (3d Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986) (In commenting on a mail fraud conspiracy indictment, the court stated, "a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not create an impermissible variance."). One district court judge in New Jersey has explicitly rejected the second circuit approach. *See United States v. Local 560, Int'l Brotherhood of Teamsters*, 581 F.Supp. 279, 332 (D.N.J. 1984) ("I conclude that proof of a state of mind apart from that required for the commission of the predicate offenses must be demonstrated for each alleged conspirator."). This court adopts the reasoning of *Teamsters*. If the evidence at trial shows unrelated multiple conspiracies, defendants will be entitled to acquittal on the RICO conspiracy charges. *Boffa*, 513 F.Supp. at 475 ("If the evidence offered at trial presents a variance in proof demonstrating multiple conspiracies, which affects the substantial rights of the defendants, they will be entitled to acquittal on Count I [RICO conspiracy count]."). Therefore, defendants' motion is denied without prejudice to renewal at the close of the government's case.

### B. Defendants' Joint Motion to Compel the Government to Elect Between the Two Substantive RICO Counts (1 and 2)

■ Defendants seek an order requiring the government to elect between counts 1

and 2 because they are multiplicious. Count 1 alleges a violation of § 1962(c) on the basis of a "pattern of racketeering" and count 2 alleges a violation of § 1962(c) on the basis of a "collection of unlawful debt." Defendants argue in their joint brief that each count charges the same conduct as evidenced by application of the "same evidence" test. Memorandum of Law ("MOL") in Support of Defendants' Substantive Motions 61–63. In their reply brief, defendants shift their argument to one focusing on the "allowable unit of prosecution." Reply MOL In Support of Defendants' Substantive Motions 21–22. The court rejects both arguments and finds that counts 1 and 2 are not multiplicious.

" 'Multiplicity' is the charging of a single offense in several counts." 1 C. Wright, *Federal Practice and Procedure* Criminal 2d § 142 at 469. Count 1 alleges among other predicate acts, certain extortionate acts under 18 U.S.C. § 892 (extortionate extension of credit and related conspiracy), and § 894 (extortionate collection of debt and related conspiracy). Count 2 alleges collection of unlawful debt. These counts do not charge the same criminal conduct. Extortion is defined in 18 U.S.C. § 1951(b)(2) as "the obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence or fear...." Unlawful debt is defined in pertinent part under RICO as "a debt ... which is unenforceable under state or federal law in whole or in part as to principal or interest because of the laws relating to usury...." 18 U.S.C. § 1961(6). The count 2 charge does not require proof of extortionate actions. In order to determine if these counts charge separate criminal conduct, one must inquire as to "whether proof of one offense charged requires an additional fact that proof of the other offense does not necessitate." *United States v. Carter,* 576 F.2d 1061, 1064 (3d Cir.1978); *see also Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). In the RICO context, a number of circuits have adopted a five-point test to determine if "pattern of racketeering" counts are multiplicious. *United States v. Ruggiero,* 754 F.2d 927, 932 (11th Cir.), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2661, 86 L.Ed.2d 277 (1985) (Counts are multiplicious if they involve: (1) same time period, (2) same place, (3) same persons, (4) same statutes, and (5) same nature and scope of activities.); *see also United States v. Russotti,* 717 F.2d 27, 33 (2d Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); *United States v. Dean,* 647 F.2d 779 (8th Cir.), *modified on other grounds,* 667 F.2d 729 (8th Cir.1982), *cert. denied,* 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). It is clear that the nature of extortion activities requires a showing of additional proof to the showing required for unlawful debt collection activities.

Defendants argue in their reply brief that the "same evidence" test is not determinative and instead, point to the "allowable unit of prosecution" of § 1962(c). They assert that the unit is "the conduct of the enterprise." Reply MOL at 23. However, the court reads § 1962(c) as containing three elements. The first is a person associated with an enterprise, the second is an enterprise involved in interstate or foreign commerce, and the third is participation in such conduct through one of two prongs: a pattern of racketeering or collection of an unlawful debt. All three elements make up the unit of prosecution. *See generally United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981).

It appears that prosecutions under the unlawful debt provisions are rare. *United States v. Pepe,* 747 F.2d 632, 673 (11th Cir.1984). However, prosecution of the same defendant in multiple counts under § 1962(c) alleging different patterns of racketeering has been allowed. *Ruggiero,* 754 F.2d at 931 ("Because of this separate [pattern of racketeering] element, an individual may be prosecuted for more than one violation of subsection § 1962(c) in connection with the same enterprise, so long as each violation involved a 'different pattern of racketeering activity.' ") (citations omitted). One court has noted *in dicta* that stating an unlawful debt charge and a

pattern of racketeering charge in separate counts would be acceptable. *Pepe,* 747 F.2d at 659. This court finds that the pattern of racketeering charge and the unlawful debt charge allege different violations of the same statute and are not multiplicious.

The defense's reliance on *Sanabria v. United States,* 437 U.S. 54, 69 n. 24, 98 S.Ct. 2170, 2182 n. 24, 57 L.Ed.2d 43 (1978), is misplaced. *Sanabria* addresses a single violation of a single statute. This court's review of the indictment in this case shows that counts 1 and 2 charge different violations, one for a pattern of racketeering and one for collection of unlawful debt. *Cf. United States v. Dean,* 647 F.2d at 788 (Determination in a given case of the number of patterns or agreements requires examination of the four corners of the charges.). Defendants' motion is denied.

## C. Defendants' Joint Motion to Strike Surplusage from the Indictment

Defendants move to strike as surplusage portions of the indictment including the preamble (5 pages preceding count 1), the use of the words "racketeering" and "loansharking," and the use of aliases. In addition, at oral argument defendants moved to strike phrases such as "and with others" and "and other criminal means."

> A motion to strike surplusage from an indictment is addressed to the sound discretion of the District Court and should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter.

*Dranow v. United States,* 307 F.2d 545, 558 (8th Cir.1962); *see also United States v. DeFabritus,* 605 F.Supp. 1538, 1546 (S.D. N.Y.1985). The court will apply the above articulated standard to language challenged by defendants.

### (1) The Preamble

The indictment contains a five-page preamble including a descriptive paragraph on each of the twenty-one defendants. They appear to be arranged in an order of importance in terms of criminal culpability—defendant Gaetano Vastola, the alleged "boss," is first, followed by the nine other RICO defendants, who are in turn followed by the eleven non-RICO defendants.

■ The government characterized the preamble as a "roadmap" at oral argument and asserted that it "modifies" the 114 counts of the indictment. The court is not opposed to the idea of the use of a roadmap-type preamble in a complex multi-defendant case. However, the particular preamble in question raises several serious concerns.

First of all, it contains additional narrative which is not contained in the counts of the indictment. The preamble is not simply a roadmap indicating which defendants are indicted for which crimes. It contains information which may be meaningful to a jury's consideration of the guilt of the defendants. For example, the paragraph describing defendant Vastola states that he was the "boss of the Vastola Organization," that he "represented his Organization in its dealings with other criminal groups," and that he was in a "position of ultimate authority." The paragraph describing defendant Brocco, a RICO defendant, states that he was a "cousin and close associate of Vastola," that he "frequently directed the illegal conduct of other members," and that he participated in "most of the criminal activities of the organization." The paragraph describing defendant Uris, a non-RICO defendant, states that he was "actively involved in the operation of the Vastola Organization's illegal bookmaking facility on Staten Island." The court is concerned that the jury's deliberations will be unduly influenced by the preamble (the jurors have a copy of the indictment while deliberating), yet the jury will not explicitly be required to evaluate the probativeness of this information. Since the information is not specifically confined within any particular count or counts, the court is concerned that the jury could refer to it and consider it in evaluating counts to which it does not apply. For example, defendant Vastola's "dealings with other criminal groups" as described in the preamble may be considered by the jury in evaluating

each and every charge against him, when only some of those charges involve such dealings. The preamble lacks any instructive device to link the narrative information contained in it with the particular charges it is meant to modify. The danger is particularly acute for the non-RICO defendants who are included in the same preamble listing as the RICO defendants. Each non-RICO defendant is described as carrying out a criminal activity of the "Vastola Organization" or the "Vastola enterprise." The references in the narrative to the organization or enterprise are relevant to the RICO allegations and thus not necessarily unduly prejudicial to the RICO defendants. The content of the narrative on the non-RICO defendants along with the location in the same preamble listing as the RICO defendants may lead the jury to infer that the non-RICO defendants are accused of RICO crimes. Anything in the indictment that allows the jury to infer involvement with uncharged crimes (whether the inference is based on the location of narrative descriptions or the content of such descriptions) is improper. *DeFabritus*, 605 F.Supp. at 1547; *United States v. Hubbard*, 474 F.Supp. 64, 82–83 (D.D.C.1979); *United States v. Brighton Bldg. and Maintenance Co.*, 435 F.Supp. 222, 230 (N.D.Ill.1977), *aff'd* 598 F.2d 1101 (7th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979).

In addition to the court's concern that narrative information in the preamble will be used to modify charges to which it does not apply, the preamble contains irrelevant and vague language which may imply guilt by association or insinuate unalleged facts. For example, defendant Brocco is described as a "cousin" of Vastola who "frequently directed illegal conduct" and who participated in *"most* of the criminal activities." (emphasis added). Although the government's evidence may turn out to prove these allegations, they are not specifically relevant to all the crimes alleged and allow improper inferences.

> [T]he words "various," "including but not limited to the following," "among other things," "and related matters," "on a number of occasions," "at least," "oth-

er illegal and improper activities," "and elsewhere," and "besides the defendants" shall be stricken from the indictment as irrelevant and prejudicial.

*Hubbard*, 474 F.Supp. at 82.

In addition to this court's apprehension of the prejudicial effect of the preamble on jury deliberations, the court is concerned with the prejudicial effect on the jury of listening to the *judge* recite this preamble at the opening of the case. The court in no way is ruling that the government is prohibited from properly introducing these allegations in opening to the jury.

The court has considered various alternative means to remedy its above described objections to the preamble. The prejudice to the non-RICO defendants is the most serious objection and the most difficult to remedy. If the court were to strike the narrative as to the non-RICO defendants and the objectionable language (described later in subparts 2–4) as to the RICO defendants, the resulting preamble would be so tortured that it would be of little use. Therefore, the court will strike the entire preamble.

As alluded to earlier, this court is not opposed to the use of a preamble per se. However, its function should be to serve as a guide to what is alleged in the counts that the jury will actually evaluate. It should not contain additional information to what is alleged in the counts, nor should it contain terminology that carries with it connotations of culpable behavior. The court notes *in dicta* that the problem of the inference of uncharged crimes bearing on the non-RICO defendants could be cured either by striking references to the RICO enterprise in the narrative following each non-RICO defendant's name, or by confining such references to the count charging the RICO enterprise.

**(2) "Racketeering" and "Loansharking"**

The challenge to the use of the word "racketeering" is without merit. It is a statutory term and used throughout the indictment in a reasonable manner. *United States v. Ianniello*, 621 F.Supp. 1455, 1479 (S.D.N.Y.1985), *aff'd*, 808 F.2d 184 (2d

Cir.1986); *United States v. Persico*, 621 F.Supp. 842, 860 (S.D.N.Y.1985).

The defendants also challenge the use of the word "loansharking," which is not a statutory term. The term is used on numerous occasions; in count 1 for example, "loansharking and extortion" and "loanshark victims." *See* counts 1, 1(b), and 2(c). In addition, the chart in count 1 entitled "Pattern of Racketeering Activity—Racketeering Acts" includes a category of "Loansharking and extortion" acts which correspond to counts 30, 31, 35, 36–39, 40, 95, and 97. The court is concerned that the term "loansharking" as used is redundant and will have an inflammatory effect on the jury. The word "loansharking" is defined as "the practice of lending money at exorbitant rates of interest," *Websters' New Collegiate Dictionary* 674 (1975), yet the court is concerned that the word has connotations of threatening behavior. To the extent that the word is used to suggest threatening behavior, it is redundant because "extortion," a statutory term, already accompanies it. ("Extort" is defined as "to obtain from a person by force or undue or illegal power of ingenuity." *Id.* at 406). To the extent that the term "loansharking" is used to describe "criminally usurious loans" the term is prejudicial because these activities are not necessarily violent or threatening. *See United States v. Hubbard*, 474 F.Supp. at 83 ("The Court finds that the use of such colorful words [e.g. infiltrate, burglary ...] to describe the allegations in the indictment is improper where less colorful and more accurate words would suffice."). The court is aware that other courts have found such colorful terms appropriate where the government will attempt to prove their relevance to the counts charged, *United States v. Gambale*, 610 F.Supp. 1515, 1544 (D.Mass.1985), but the court finds for the above-stated reasons that in the context of this indictment the term "loansharking" serves no useful purpose. Therefore, the government may elect between striking the terms "loansharking" and "loanshark" or replacing them with a form of the more objective terms noted above.

### (3) Aliases

■ The defendants have moved to strike the use of aliases in the indictment. The government has argued that the pleading and proof of aliases is necessary to identify the defendants' illegal actions. *United States v. Persico*, 621 F.Supp. at 861. Although this point was not specifically addressed at oral argument, the court assumes from the government's representations that it plans to introduce at trial such proof as to each alias used in the indictment. The court will request such a representation on the record from the government when the government next makes a pre-trial appearance before the court. The defendants' motion is denied without prejudice to their right to renew the motion if the government fails to make such a representation, or if the government fails to introduce such proof in the presentation of its case at trial. *Id.* at 861.

### (4) "[A]nd with others" and "and others" and "and other criminal means"

■ At oral argument, defendants moved to strike the terms "and with others" and "and others" and "and other criminal means." *See e.g.* counts 30, 37. These types of terms "may encourage the jury to draw inferences that the defendants are believed to be involved in (illegal) activities not charged in the indictment". *Hubbard*, 474 F.Supp. at 82; *see also DeFabritus*, 605 F.Supp. at 1547; *Brighton*, 435 F.Supp. at 230–31 (striking "among others") (the government may not use the indictment to "persuade the jury that the crime alleged has great and hidden implications") (footnote omitted). The terms "and with others" and "and others" and "and other criminal means" are to be struck from the indictment. In conclusion, the court notes that by striking the language described above, it does not foreclose the government from presenting any proof relevant to the charges at trial. *See e.g. DeFabritus*, 605 F.Supp. at 1547. These alterations do not broaden or materially alter the charging terms of the indictment. *United States v. Atisha*, 804 F.2d 920, 927 (6th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 955,

93 L.Ed.2d 1003 (1987); *United States v. Dawson*, 516 F.2d 796, 804 (9th Cir.), *cert. denied*, 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 80 (1975). Defendants' motion to strike surplusage is granted in part and denied in part.

### D. Defendant Farone's Motion to Dismiss Counts 1 and 3

Defendant Farone argues that RICO counts 1 and 3 against him must be dismissed for failure to plead a pattern of racketeering. A "pattern of racketeering activity" requires at least two acts of racketeering activity. 18 U.S.C. § 1961(5). Farone is indicted under five counts other than the RICO counts (28, 30, 31, 33, 34). Count 28 alleges extortion related to a 1.25 million dollar purchase of "cut-out" records from MCA Records, Inc. ("MCA transaction"), in violation of 18 U.S.C. § 894. Counts 30 and 31 allege the making of extortionate extensions of credit and the collection of such credit pertaining to seven individuals, including a $50,000 credit to John LaMonte. Counts 33 and 34 allege interference with commerce by threats or violence by means of extortion in the MCA transaction and usurious interest payments on the $50,000 LaMonte loan. The "Pattern of Racketeering-Racketeering Acts" chart in the indictment lists multiple counts with each act. The acts relevant to Farone are associated with the counts indicated as follows: Act 17–counts 28, 33, 34; Act 18–counts 30, 31. The test for determining whether two acts constitute a pattern has been succinctly articulated as follows:

> RICO "pattern" requires separate criminal transactions or events, but all these acts can comprise one fraudulent scheme and still form a "pattern" provided that the transactions share common perpetrators, victims or motives, extend over a substantial period of time, and that the transactions do not simply involve ministerial acts.

*United States v. Freshie Co.*, 639 F.Supp. 442, 445 (E.D.Pa.1986), (*citing Graham v. Slaughter*, 624 F.Supp. 222, 224–25 (N.D. Ill.1985)). The *Freshie* court found that *Sedima* did not require two different criminal episodes. *Id.* (discussing *Sedima S.P.*

*R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985)) (The *Sedima* discussion of the RICO legislative history points out that a mere showing of two acts is not sufficient. Instead, the Court requires a showing of "continuity plus relationship." "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e)."). In applying *Sedima*, the second circuit has stated that "when a person commits at least two acts that have the common purpose of furthering a continuing criminal enterprise ...," the *Sedima* requirement is met. *United States v. Ianniello*, 808 F.2d 184, 192 (2d Cir.1986). These two transactions allegedly share common perpetrators, victims, and motive, and extend over a significant period of time. Therefore, they are plead properly under the two act pattern test articulated in *Freshie* and *Ianniello*.

Farone challenges the pattern of racketeering allegations against him on the grounds that he is only charged with a single act of extortion against John LaMonte. The court's review of the indictment shows this not to be the case. Count 28 is for extortion related to the 1.25 million dollar MCA transaction, and Counts 30 and 31 pertain to a $50,000 extortionate extension and collection of credit from LaMonte.

In addition, counts 30 and 31 list six other extortion victims. A finding of guilt as to any one of these victims amounts to an act. The indictment includes all seven victims in the same RICO act and the same count, but a special verdict sheet accompanied by a jury instruction can elicit factual findings on each victim for each defendant named in the count. *United States v. Louie*, 625 F.Supp. 1327, 1339 (S.D.N.Y. 1985), *appeal dismissed*, 787 F.2d 65 (2d Cir.1986). Defendants' challenge does raise the *possibility* that Farone could be convicted of two counts among 30 or 31, and 33, for the sole act of extorting or

conspiring to extort John LaMonte on an interest payment on the $50,000 loan. This assumes Farone would be acquitted on the MCA transaction allegation in counts 28, 33, and 34, and allegations under 30 and 31 pertaining to all alleged extortion victims except LaMonte. This possibility raises the question whether such convictions could support a pattern of racketeering count. Sufficient proof of an extortionate interest payment on the $50,000 loan to LaMonte could support a conviction on count 30 or 31, (extortionate extension of credit and collection) and count 33 (extortionate interference with commerce) because the "unit of prosecution" under each statute is different. *See United States v. Provenzano*, 334 F.2d 678, 684 (3d Cir.), *cert. denied*, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). However, it would not support a conviction of a RICO pattern. This would violate the *Sedima* continuity requirement designed to prevent "one transaction sliced into a series of facts." *Freshie*, 639 F.Supp. at 444. Such proof would not demonstrate acts which are "sufficiently differentiated," to make up a RICO pattern. *Id.* at 445, (*quoting Kredietbank, N.V. v. Joyce Morris, Inc.*, No. 84–1903, slip op. at 5 (D.N.J. January 9, 1986) [Available on WESTLAW, DCT database]). Therefore, a special verdict sheet will be necessary for counts 28, 29, 30, 31, and 34. Appropriate jury instructions will insure that, in the event of a RICO conviction, such conviction is supported by a unanimous jury finding of guilt on two separate acts. Counts 33 and 34 will require a special verdict sheet indicating whether a conviction is based either on the MCA transaction or the interest payment on the $50,000 loan. *Cf. United States v. Dansker*, 537 F.2d 40, 51 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977) (Where defendants were indicted in a conspiracy count which was submitted to the jury on alternative theories (bribing of two different officials), and the court ruled that the government failed to prove bribery on one of the theories, a *general* verdict of guilty on the conspiracy count was vacated: "In the instant case, the possibility thus remains, albeit slim, that the jury found that

the defendants engaged in a conspiracy to bribe Serota alone....") (emphasis added). The indictment properly pleads a pattern of racketeering against Farone. Defendant Farone's motion is denied.

### E. Defendants' (Levy and Fisher) Motion to Dismiss Counts 33 or 34 as Duplicitous or in the Alternative to Force the Government to Elect Between Charges Alleged

Counts 33 and 34 charge the same nine defendants with interference with commerce by threats or violence, 18 U.S.C. § 1951. Count 33 is a conspiracy count. Each count alleges that the means of such interference were related to the MCA transaction extortion and collection of usurious interest payments on separate loans. Defendants challenge each count on the basis of duplicity.

Duplicity is the joining in a single count of two or more distinct separate offenses. *United States v. Starks*, 515 F.2d 112, 116 (3d Cir.1975). The "unit of prosecution" under the Hobbs Act, 18 U.S.C. § 1951, is "interference with commerce." *Provenzano*, 334 F.2d at 685. The jury can base its determination on any one of the enumerated acts that the statute allows, (i.e. robbery, extortion, conspiracy) and that the indictment alleges. The fact that the government has conceded that Levy and Fisher "are not to be alleged to be involved in the collection of the $50,000 loan," MOL of United States in Opposition at 43 n. *, is not grounds to dismiss either count. The counts contain other adequate allegations against Levy and Fisher.

At oral argument, defendant Canterino joined the motion and argued that a conviction under either count could not stand as to any defendant for which there is inadequate proof indicating involvement with the collection of the interest payments on the $50,000 loan. Canterino asserts that the government will not be able to prove that he was associated with the $50,000 loan. However, the government has only asserted that Levy and Fisher are not associated with the loan. MOL of United States. Canterino relies on the proposition of law

that a conviction on a conspiracy count submitted to the jury on alternate theories cannot stand when there is inadequate proof on one of those theories. *See United States v. Tarnopol,* 561 F.2d 466, 474–75 (3d Cir.1977); *Dansker,* 537 F.2d at 51.

The alternate theories in the case at bar, as discussed by counsel at oral argument and apparent from the indictment, are (1) a theory based on the 1.25 million dollar MCA transaction, and (2) one based on the $50,000 loan to LaMonte. A special verdict sheet and jury instruction can ensure that the $50,000 loan not be considered against Levy and Fisher (and others if necessary). This will prevent the possibility of problems associated with duplicity. *United States v. Alsobrook,* 620 F.2d 139, 142 (6th Cir.), *cert. denied,* 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980); *Starks,* 515 F.2d at 116 (such problems include double jeopardy, prejudice at sentencing and on appeal, conviction on less than a unanimous determination, and prejudice of evidentiary rulings). Therefore, defendants' motion is denied.

It became evident at oral argument that counsel for Levy, Fisher, and Canterino, are particularly concerned about the prejudicial effect of being associated with the alleged beating of John LaMonte on May 18, 1985. That alleged beating is the subject of count 32, which names only Vastola, Brocco, and Saka. Various defendants argue that the evidence will show this to be the only violent act carried out by defendants. Therefore, they wish to distance themselves from allegations of violent acts. Counts 33 and 34 link the $50,000 loan to LaMonte with the 1.25 million dollar extortionate MCA transaction involving LaMonte, as an alternate factual basis for an 18 U.S.C. § 1951 conviction. However, the court notes that the nine defendants named in counts 33 and 34 are also named in a number of other counts involving extortion. In any event, the court will not speculate on the probativeness of this evidence, nor the prejudicial effect of the evidence, at this time. The court is obligated to test the indictment against the defense challenges on the basis of those allegations contained on the face of the document. *Hamling v.*

*United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Boffa,* 513 F.Supp. at 471, 474. In doing so, the court finds that counts 33 and 34 are properly pled.

### F. Defendant Harris' Motion to Dismiss Counts 41, 48, and 75 as Insufficient Pleadings and For a Bill of Particulars

Defendant Harris is indicted in three counts: count 41, conspiracy to commit wire fraud pertaining to a "bust-out scheme"; count 48, conspiracy to commit fraud pertaining to use of a Western Union authorization code; and count 75, substantive fraud pertaining to use of an authorization code. Defendant moves for dismissal, arguing that the indictment fails to provide adequate notice to enable him to prepare a defense.

Allegations in a conspiracy count need not be stated with the specificity required of a substantive count. *See e.g., United States v. Clark,* 649 F.2d 534, 539 (7th Cir.1981). The count is sufficient if it pleads the statutory language and contains an adequate statement of an overt act to carry out the conspiracy. *United States v. Sterkel,* 430 F.2d 1262, 1263 (10th Cir. 1970). Only one member, not each member, of the conspiracy need commit an overt act. *United States v. Flaherty,* 668 F.2d 566, 580 n. 4 (1st Cir.1981). Counts 41 and 48 adequately describe a conspiracy in violation of 18 U.S.C. § 1343 and include the required listing of an overt act. They also include a full statement of all the elements necessary to constitute the offense. *Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962). Wire fraud, 18 U.S.C. § 1343, requires the existence of a scheme to defraud by means of false pretenses and the use of interstate wire communications in furtherance of the scheme. *United States v. Brien,* 617 F.2d 299, 307 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980). Conspiracy, 18 U.S.C. § 371, requires the showing of an agreement to commit a crime. *United States v. Borelli,* 336 F.2d 376, 384 (2d Cir.1964),

*cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Count 41, ¶ 4, articulates Harris' specific role in the "bust-out" scheme, to attend trade shows and place orders intending not to pay for the orders. The count, at ¶ 1, also alleges an agreement among five conspirators and describes a scheme to defraud. Count 48 alleges a scheme to defraud Western Union Telephone subscribers, a time frame in which the scheme was enacted, and a list of conspirators. In order to prove a violation by Harris in counts 41 and 48, the government must show Harris was a knowing participant in the conspiracy. *United States v. Abrams,* 539 F.Supp. 378, 383 (S.D.N.Y.1982). Count 75 specifically identifies Harris' alleged substantive Western Union crime. As a matter of pleading, the indictment is adequate on all three counts. *Roberts v. United States,* 226 F.2d 464, 466 (6th Cir.1955); *cert. denied,* 350 U.S. 935, 76 S.Ct. 307, 100 L.Ed. 817 (1956). However, the court finds in its discretion that the defendant is entitled to a more detailed factual description of his alleged role in the bust-out and Western Union conspiracies in order to avoid prejudicial surprise at trial. *United States v. Burgio,* 279 F.Supp. 843, 846 (S.D.N.Y.1968). Defendant's motion to dismiss is denied. His motion for a bill of particulars as to counts 41 and 48 is granted, as incorporated into the bill of particulars ruling at part IV–F of this opinion.

### G. Defendant Majuri's Motion to Dismiss Counts 3 and 98

Majuri is indicted in four counts: count 3, RICO conspiracy; counts 98 and 99, gambling conspiracy and gambling; and count 108, possession of firearms. At oral argument Majuri argued for dismissal of the RICO conspiracy count. Majuri points out that neither of the "substantive" RICO counts, pattern of racketeering and collection of unlawful debt (which are incorporated by reference into the RICO conspiracy count), so much as mentions Majuri's name.

 The conspiracy count is sufficient if it pleads the statutory language and contains an adequate statement of an overt act. *Sterkel,* 430 F.2d at 1263. A

RICO conspiracy defendant must only agree to the commission of the predicate acts and need not agree to commit those acts personally. *United States v. Adams,* 759 F.2d 1099, 1116 (3d Cir.1985). "The element of knowingly and willfully combining, conspiring and agreeing to conduct and participate in the affairs of the enterprise is a sufficient allegation to withstand a motion to dismiss or sever." *United States v. Salerno,* No. 586 Cr. 245, slip op. at 11 (S.D.N.Y. March 10, 1987). In order to prove a violation the government must show Majuri was a knowing participant in the conspiracy. *United States v. Abrams,* 539 F.Supp. at 383. The indictment adequately pleads the conspiracy. The fact that Majuri is not indicted under counts 1 and 2 is not a fatal flaw to his being named in count 3. However, the indictment lacks enough particularized information to allow Majuri to do pretrial investigation in support of a defense to this count. *Burgio,* 279 F.Supp. at 846. The motion to dismiss count 3 is denied. The motion for a bill of particulars as to count 3 is granted, as incorporated into the bill of particulars ruling at part IV–F of this opinion.

Majuri also challenges count 98, arguing that it charges multiple conspiracies instead of a single conspiracy. Count 98 on its face charges only a single conspiracy. The allegation is of a single agreement involving multiple offenses. *United States v. Maker,* 751 F.2d 614, 625 (3d Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985); *Boffa,* 513 F.Supp. at 474. The ultimate question of whether there was a single conspiracy, multiple conspiracies, or no conspiracy at all, will be resolved at trial. *United States v. Smith,* 789 F.2d at 200. Majuri's motion to dismiss count 98 is denied.

## III. MOTIONS TO SEVER

### A. The Severance Plan

 The defendants move jointly for severance under Fed.R.Crim.P. 8 and 14, and several defendants file motions to sever individually (Levy and Fisher also rely on Rule 2 as an authority in support of severance). For the reasons stated below,

the motions to sever are granted in part and denied in part. Rule 8 is not permissive; the rule requires severance as a matter of law based on the pleadings. *United States v. Somers,* 496 F.2d 723, 729 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). In a multi-defendant case, Rule 8(b) applies. 1 C. Wright, *Federal Practice and Procedure* Criminal 2d § 144 at 494 & n. 1 (*citing United States v. Perry,* 731 F.2d 985, 989 (D.C.Cir.1984)). Rule 8(b) has been read as independent and exclusive of Rule 8(a). Wright, § 144 at 495. Therefore, the "common scheme or plan language" of Rule 8(a), which is broader than the 8(b) language, is not applicable under Rule 8(b).

When similar but unrelated offenses are jointly charged to a single defendant, some prejudice almost necessarily results, and the same is true when several defendants are jointly charged with a single offense or related offenses. Rule 8(a) permits the first sort of prejudice and Rule 8(b) the second. But the Rules do not permit cumulation of prejudice by charging several defendants with similar but unrelated offenses.

*Cupo v. United States,* 359 F.2d 990, 993 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967). Separate and unrelated conspiracies, not related as elements of a RICO enterprise, cannot be joined together in the same prosecutions. *See e.g. United States v. Weisman,* 624 F.2d 1118, 1129 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980) (if offenses are adequate to be plead as RICO predicate acts, they can be joined under Rule 8(b)).

■ Rule 14 allows the court in its discretion to sever on the basis of prejudicial joinder of defendants or offenses. A severance is not required merely because one would improve a defendant's chances of acquittal. *United States v. Rucker,* 586 F.2d 899 (2d Cir.1978). A defendant must show that joinder would result in a manifestly unfair trial. *United States v. Reicherter,* 647 F.2d 397, 400 (3d Cir.1981).

The defendants have made a joint severance suggestion as follows:

*Trial #1* Extortion/Loansharking Offenses (Counts 28–40)

*Trial #2* Frauds (Credit, Western Union, Insurance, Bankruptcy), and Copyright Infringement (Counts 41 & 97)

*Trial #3* Gambling Offenses (Counts 98–106)

M.O.L. in Support of Defendants' Substantive Motions (this proposal omits counts 1–27 and 107–114). This proposal drew widespread support from various defense counsel at oral argument. The government opposed any severance.

For the reasons stated below, the court will sever this matter into several separate trials. Trial of the RICO defendants will be severed from non-RICO defendants for purposes of case management. The non-RICO defendants will be tried in a series of separate trials under the requirements of Rule 8(b). The trials will include the following offenses:

### Severance Plan

A. *Non-RICO Defendants*

1. Extortion—Counts 28, 33, 34. (Defendants Canterino, Levy, and Fisher)

2. Bust-Out Fraud—Counts 41, 46, 47. (Defendants Howard and Harris)

3. Western Union Telephone Fraud—Counts 48, 75, 80, 81, 82. (Defendants Howard, Harris, Brennan, Marino, and Sanzaro)

4. Insurance Fraud—Count 91. (Defendant Marino)

5. Gambling—Counts 98–106. (Defendants D'Alessio, Sr., D'Allessio, Jr., and Uris)

B. *RICO Defendants*

6. RICO enterprise charges and all charges against 10 defendants named in count 3 (counts 1–45, 48–74, 76–79, 83–106, and 111–114). Counts 107–110 to be tried in the second stage of a bifurcated trial. (Defendants Vastola, Brocco, Massaro, Farone, Martire, Saka, Stone, Santoni, Zito and Majuri)

7. Firearms charges against Majuri—Count 108. (Defendant Majuri)

## 1. The RICO Trial

■■■ Rule 8(b) allows for trial of all defendants "alleged to have participated in the same act or transaction or in the same series of acts or transactions." Wright, § 144 at 495; (citing *United States v. Kenny*, 645 F.2d 1323, 1344 (9th Cir.), cert. denied, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Corral Martinez*, 592 F.2d 263, 268 (5th Cir. 1979)). Offenses linked to a common conspiracy may be joined together. *Smith*, 789 F.2d at 206. The second circuit has specifically held that RICO predicate acts in a pattern of racketeering activity may "constitute part of a 'series of acts or transactions constituting an offense' within the meaning of Rule 8(b)." *Weisman*, 624 F.2d at 1129. Joinder of all the RICO defendants will allow the government to develop the entire RICO conspiracy as charged. *United States v. Provenzano*, 688 F.2d 194, 199 (3d Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982). To force the government to try some of the alleged criminal activities separately from others alleged to be part of the same RICO enterprise would prevent the government from prosecuting the type of crimes the statute was intended to combat. *Persico*, 621 F.Supp. at 854; *see also Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528. The defense has also sought severance of various criminal activities on the theory that extortion and narcotics activities as alleged will have prejudicial spillover onto the other "white collar" activities alleged. The court does not accept this argument. All of the criminal activities, except the weapons offenses, are alleged to be affairs of the enterprise. The court is confident that the jury will be able to compartmentalize the different types of criminal activities. *Dansker*, 537 F.2d at 62; *Persico*, 621 F.Supp. at 853; *see also United States v. Castellano*, 610 F.Supp. 1359, 1412–13 (S.D.N.Y.1985) (denial of severance motion of defendants not associated with alleged murder). The indictment properly pleads a RICO enterprise conspiracy, thus all defendants so named and offenses alleged to be affairs of the enterprise may be joined under Rule 8(b). *Somers*, 496 F.2d at 729

("A Rule 8(b) motion is addressed to the pleadings, and not to the proof subsequently adduced."). As to the alleged prejudicial nature of the extortion and narcotics evidence to be presented to the jury, the court has a continuing obligation under Rule 14 to evaluate the prejudicial effect of such evidence and take any necessary steps. Wright, § 144 at 521, (*citing Schaffer v. United States*, 362 U.S. 511, 514, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1960)).

### a. Case Management

The severance of the RICO defendants from the non-RICO defendants is necessary for case management reasons. The court notes that a severance of RICO from non-RICO defendants will in no way prejudice the government in its efforts to enforce the RICO statute. *See United States v. Persico*, 621 F.Supp. at 854 (goal of statute is to prosecute organized crime). All criminal activities and defendants alleged to be part of the criminal enterprise will be tried in one joint trial. Other courts have employed severance on manageability grounds in similar multi-defendant cases, although the efficiency outcome of such plans has yet to be demonstrated. *See* M.O.L. in Opposition at 76–77 (discussing *United States v. Castellano*, transcript at 13, September 9, 1985) (remarks of Judge Duffy) and *United States v. Gallo*, No. 86–452, slip op. (E.D.N.Y. July 8, 1986) (Defendants' Exhibit D) (Government contends Judge Weinstein severed on case management grounds).

The court, in its discretion, could allow for the joinder of the non-RICO defendants with the RICO defendants. *See e.g., United States v. Castellano*, 610 F.Supp. 1359, 1396 (S.D.N.Y.1985). The court, however, recognizes that the present case is complicated both by the number of different types of criminal activities alleged and the number of defendants charged. It is likely that severance will lead to some redundancy in the presentation of evidence. However, there are also efficiencies associated with severance. It will not be necessary for the non-RICO defendants, who are named in a relatively small number of

counts, and their counsel to sit through a trial estimated to take 12 months, when the proof that concerns them could be put forward in a matter of days. The possibilities of delay caused by scheduling problems of counsel and extended cross-examination in a 21–defendant trial will be somewhat reduced by the severance. The specter of managing 21 defendants and their counsel also presents difficulties to the court system in terms of providing adequate physical space. The system would be strained to provide a courtroom large enough to hold all these people and to provide rooms for consultation among counsel.

The confinement of RICO charges to one trial will assist each of the several juries in compartmentalizing the evidence put before it. The court recognizes that the total time spent in court on the several trials, mandated by this severance plan, may equal the 12–month estimate of the 21–defendant trial. However, use of several different juries, each for a shorter duration of time, is an important factor in increasing the efficiencies and the abilities of each jury to reach a fair result. The inevitable delays caused by illness and scheduling problems of jurors will become much more manageable in the context of shorter trials. The likelihood of obtaining a diverse cross section of the population in the selection of a jury is heightened by greater availability of jurors to serve in trials that do not interrupt employment as severely as would the estimate one year interruption in the case at bar. An exceedingly long trial mitigates against the jury's ability to devote its full attention to the trial and to properly evaluate and recollect all the evidence. Of course, in the exceptional case, a lengthy trial cannot be avoided and is in fact the best mechanism to achieve a fair trial for all parties. However, the indictment in the case at bar does not present the exceptional case. Based upon considerable experience in presiding over jury deliberations, this court is confident that the severance plan will better enable each jury to play its central role in achieving the goal of a fair trial.

### b. Firearms Charges

#### i. Title 18 U.S.C. App. § 1202

The court is concerned about the prejudicial effect of a trial that includes firearms charges which require proof of previous felony convictions. Title 18 U.S.C. App. 1202(a)(1) makes possession of firearms by a previously convicted felon an offense. Counts 107–110 charge various RICO defendants with this offense. The court finds that presenting evidence or even the mere fact of a prior felony conviction to a jury would be prejudicial. The court recognizes the evidence may be "otherwise admissible," and that some courts employ such a test to determine if prior conviction evidence may come in. *See United States v. Sanko*, 787 F.2d 1249, 1251 (8th Cir.1986); *United States v. Begun*, 446 F.2d 32, 33 (9th Cir.1971). However, to avoid the possibility of prejudice resulting from admission of such evidence, the court will conduct a two-stage trial. The first stage of the trial will consist of the presentation of the entire RICO case, jury deliberations, and a verdict, on all the counts except 107–110. The second stage will include the trial of counts 107–110, those counts requiring proof of a prior conviction under 18 U.S.C. App. § 1202(a)(1). This approach, which is suggested as a possible solution to the prior conviction prejudice problem in the government's brief, M.O.L. in Opposition 88, has been employed by the District of Minnesota and cited with approval by the third circuit *in dicta*. *United States v. Busic*, 587 F.2d 577, 585 (3d Cir.1978), *rev'd on other grounds*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980) (*citing United States v. Franke*, 331 F.Supp. 136 (D.Minn.1971)). This court's bifurcation ruling pertains only to the preclusion of submitting prior conviction evidence for the purpose of proving § 1202 offenses, and in no way serves as a ruling on the question of admitting prior conviction evidence for any other purpose.

#### ii. Title 26 U.S.C. § 5861

The firearms charges under 26 U.S.C. § 5861 (possession of unregistered and un-

identified firearms (counts 111–114) need not be tried separately from the bulk of the charges, since they do not require proof of a prior conviction. Firearms charges are recognized to be related to narcotics activity to the extent necessary to allow joinder of such charges under Rule 8(b). *Sanko,* 787 F.2d at 1251 (proof of firearms possession admissible in a narcotics trial as evidence that motive of possession is related to narcotics activity); *United States v. Milham,* 590 F.2d 717, 721 (8th Cir.1979) (judicial notice of relationship between narcotics dealing and firearms); *Begun,* 446 F.2d at 33 (9th Cir.1971) (firearms evidence would be admissible on narcotics charges).

## 2. Majuri Firearms Trial

Defendants Vastola, Brocco, and Massaro, are all charged with firearms offenses and narcotics offenses. Majuri is also charged with a firearms offense, count 108. Majuri is not specifically indicted for narcotics or extortion, but is named in two gambling counts and the RICO conspiracy count. The RICO conspiracy count does not specifically identify firearms with the enterprise as charged. The court could, within its discretion, allow joinder of all firearms charges against RICO defendants, because the enterprise is alleged to be involved in narcotics activity. *See, e.g. Sanko,* 787 F.2d at 1251. However, that would be an unfair extension of the *Sanko* line of cases. The firearms charges against Majuri appear on the face of the indictment to be totally unrelated to narcotics activity. Therefore, in order to be sure to avoid prejudice to Majuri, the court, under the authority of Rule 14, will conduct a separate trial on the firearms charges against Majuri. *United States v. Boscia,* 573 F.2d 827, 833 (3d Cir.), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978). In conclusion, with the exception of the Majuri firearms count, all RICO defendants will be tried on all counts charged in a joint bifurcated trial. The first stage will include all counts charged except counts 107–110; counts 107–110 will be tried in the second stage. In addition, Majuri's firearms count will be tried separately.

## 3. Other Individual RICO Defendants' Motions to Sever

### a. Majuri

The court notes that two of the RICO defendants, Majuri and Stone, move for a severance. Majuri argues that unless he is tried in a single trial, he will be deprived of his right to call several co-defendants as witnesses. Four factors are to be considered by the court in evaluating this motion: (1) likelihood of co-defendant's testifying; (2) degree to which such testimony may be exculpatory; (3) degree to which testifying co-defendant would be impeached; and (4) judicial economy. *Boscia,* 573 F.2d at 832. More than the showing of a possibility that a co-defendant will testify is required. *Provenzano,* 688 F.2d at 198. Majuri has alluded to co-defendant affidavits, but none have been provided in support of the motion. The alleged testimony of co-defendants, although contradictory to the government's case, would not be of a highly exculpatory nature, nor would it be beyond impeachment. *See Boscia,* 573 F.2d at 832; *but see United States v. Ditizio,* 530 F.Supp. 175, 177 (E.D.Pa.1982) (statements against penal interest to be made by co-defendants are adequate grounds for severance). Upon considering all of the *Boscia* factors, the court denies Majuri's motion. The motion is not supported by affidavits and the court finds that it would be highly speculative to sever on the basis of such limited information.

### b. Stone

Defendant Stone seeks an indefinite continuance or severance on the basis of severe health risks of trial. The court will reserve opinion on this motion pending a report from counsel following a court-ordered examination of Stone by an independent physician.

### 4. Non–RICO Defendants' Motions to Sever

Defendant Sanzaro's motion to sever is mooted by the court's severance plan. Count 31 names Sanzaro as an extortion victim. Only RICO conspiracy defendants are named in count 31. Counts 48, 80–82, name Sanzaro as a defendant in Western

Union Telephone wire fraud and conspiracy. His defense is in no way antagonistic to the defense of the Count 31 defendants. Even if they had not been severed, Sanzaro could not show what is required in order to obtain severance for mutually antagonistic defenses. *See Provenzano,* 688 F.2d at 193 (such defenses must be irreconcilable and mutually exclusive); *United States v. Crawford,* 581 F.2d 489, 491–92 (5th Cir. 1978) (Mutually antagonistic defenses found to exist where the sole defense of each was the guilt of the other.).

The motions to sever by non-RICO defendants for the most part are mooted by the court's severance plan; to the extent any motion is not moot, it is denied.

### 5. Order of Trials and Continuance Motion

The court suggests that the trials proceed in the order indicated above at part III–A. This order is based on the numerical order of counts in the indictment. The RICO trial is scheduled after the non-RICO trials due to the unavailability of Michael Rosen, Esquire, counsel for defendant Vastola. *See United States v. Gaggi,* No. 555 84 Cr. 63, order (S.D.N.Y. August 13, 1987). All counsel are to appear on September 8, 1987, at 9:30 a.m. to discuss the order of trials in this matter. Counsel should be prepared to make realistic time estimates for each trial. The first non-RICO trial will commence on October 13, 1987, and will be followed by all other non-RICO trials. The RICO trial will commence on March 7, 1988, assuming the availability of Mr. Rosen.

The motion by Mr. Rosen on behalf of defendant Vastola for an extension beyond the above-indicated dates is denied. The court has reviewed the expert report obtained by defense counsel and recognizes that the quantity of tape recordings to be screened is voluminous; however, the court is confident that an organized effort by defense counsel, along with the seven-month continuance of the RICO case, will allow for full and proper preparation of the defense. The original indictment was returned September 19, 1986. RICO defendants had nine months to prepare for pre-trial motions, and will have seven months to prepare for trial. The motion for a continuance beyond the dates listed above is denied.

## IV. MOTIONS FOR PRETRIAL HEARINGS AND DISCOVERY

### A. Defendants' (Levy and Fisher) Motion for Brady Material

Defendants Levy and Fisher are indicted in three counts of the indictment: count 28, 18 U.S.C. § 894 (extortion conspiracy), and counts 33 and 34, 18 U.S.C. § 1951 (interference with commerce by extortion conspiracy). These counts pertain to collection of an extension of credit to John LaMonte d/b/a Out of the Past, Ltd., in connection with the MCA transaction and collection of usurious interest payments on a $50,000 loan to LaMonte. The defendants' *Brady* request seeks "information indicating that Morris Levy and Howard Fisher were extorted and controlled by certain named and unnamed members of the Genovese crime LCN family." Notice of Motion to Compel Discovery, Exhibit D (Letter dated February 10, 1987). Defendants allege such material to include: (a) writings, recordings, and photographs, (b) names, addresses, and telephone numbers of people with knowledge of the extortion; and of (c) confidential informants (CI–1 through CI–13) already named in affidavits in support of wiretap applications; (d) agents' notes; (e) relevant audio and video tapes; and (f) relevant notes, memos and reports. The factual basis of the request is derived from material already disclosed to the defense which includes affidavits in support of wiretaps in several districts: Southern District of New York, Northern District of New York, Eastern District of New York, and District of New Jersey. *See* Defendants' Exhibits H–L. These affidavits contain information indicating that confidential informants had information regarding the relationship between Levy and La Cosa-Nostra ("LCN"), and the relationship between John LaMonte and the government. It appears that these wiretaps were conducted pursuant to a government investigation of the Genovese family. The affida-

vits show confidential informants had knowledge of Levy's activities and believed that he was under the control of a Vincent Gigante of the Genovese family, that his life had been threatened, and that he had tried to sever his relationship with the Genovese family. The affidavits also show that the informants believed that Levy's brother had been killed some 20 years ago in a mistaken attempt on Levy's life. The affidavits also indicate that Levy had dealings both with John LaMonte and the Genovese family over an extended period of time, including 1984 and 1985. The affidavits providing this information refer to five confidential informants: CI-2, 3, 7, 8, and 9. Affidavit of Leon Borstein, ¶¶ 30–40, filed April 24, 1987; *see also* Defendants' Exhibit H, ¶ 64. The government does not question the genuineness of these threats to Levy. It is the affidavits of government agents which articulate the threats. Defendants seek the requested information (a) to establish defenses including duress, entrapment, and due process outrageous conduct, (b) to support a dismissal motion based on grand jury misconduct, and (c) to support a severance motion based on incompatible defenses. The government opposes the *Brady* motion.

*Brady* "is not a discovery rule but a rule of fairness and minimum prosecutorial obligation." *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir.1984) (citation omitted). It requires the disclosure of exculpatory evidence. "Exculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of credibility of a crucial question of a witness." *Id.* at 260. The government has a continuing duty to identify exculpatory material and provide it to the defense. *Pennsylvania v. Ritchie*, —— U.S. ——, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). The government's determination as to the existence of *Brady* material is subject to review under a constitutional error standard. *United States v. Agurs*, 427 U.S. 97, 111–14, 96 S.Ct. 2392, 2401–403, 49 L.Ed.2d 342 (1976).

The Assistant United States Attorney ("AUSA") has represented to the court that he has not personally reviewed the investigations associated with the affidavits containing information on Levy, nor has he had detailed discussions with other government agents or attorneys who are intimately familiar with those investigations. Therefore, this court will employ its "Elizabeth Wiretaps" approach, used on a prior occasion in this case, and order the AUSA to review the government investigations concerning Levy for *Brady* information and to report its findings to the court within 15 days of the date of the attached order. *See United States v. Vastola*, No. 86–301, letter opinions (D.N.J. May 21, 1987; June 25, 1987).

The court adds the following guidance to the AUSA in its investigation and development of a report to the court. The defendants have not made an adequate showing to justify the release of the identity of confidential informants. *United States v. Jiles*, 658 F.2d 194, 197 (3d Cir.1981), *cert. denied*, 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 465 (1982). For the purposes of this motion, the court finds that the defendants have not shown that the informant's identities are essential to a fair determination of a cause. *Roviaro v. United States*, 353 U.S. 53, 60, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). The ultimate determination of the viability of the defendants' duress and entrapment defense will be made at trial. *See United States v. Ciambrone*, 601 F.2d 616, 626 (2d Cir.1979); *United States v. Glaeser*, 550 F.2d 483, 487 (9th Cir.1977). In the meantime, this court will not disturb the government's confidential informant privilege, *Roviaro*, 353 U.S. at 59, 77 S.Ct. at 627, on the basis of highly speculative assertions that the confidential informants possess exculpatory material not already in the record. *Jiles*, 658 F.2d at 198–99. In the event that the government calls a confidential informant as a witness, information pertinent to veracity must be made available at or shortly before appearance at trial. *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir.1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984); *see also United States v. Dansker*, 565

F.2d 1262, 1264 (3d Cir.1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978) (where the credibility of a key witness was placed in question by written affidavits, an evidentiary hearing should be conducted to determine if *Brady* material was being withheld).

The court also notes that defendants have called to the court's attention certain occurrences in the case of *United States v. Canterine,* No. 87–57 (S.D.N.Y.), which defendants assert have an impact on this case. Supplemental Affidavit In Support of Motion to Compel at 4–5 and Exhibit R (July 10, 1987). Defendants allege that agents in the *Canterine* case who withheld *Brady* information from the defense are also involved in the *Vastola* investigation. The AUSA is ordered to investigate this allegation and file a separate *ex parte* report with the court, identifying these agents and describing the roles, if any, of these agents in the *Vastola* investigation. Such report should be filed within 15 days of the attached order.

In conclusion, defendants' motion to compel is denied, and the government is ordered to review the above described material and file the requested reports.

## B. Defendants' Joint Motion For Pretrial Proffer Of A Single Conspiracy

■ · Defendants seek an order requiring the government to make a pretrial proffer that one RICO conspiracy (and not multiple RICO conspiracies) is charged in the indictment. The government opposes this request, relying on the proposition that the good faith allegation of a single conspiracy in the indictment allows the government the opportunity to proceed to trial on that charge. *Somers,* 496 F.2d at 729–30; *see also Maker,* 751 F.2d at 626; *United States v. Gallagher, II,* 602 F.2d 1139, 1142 (3d Cir.1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 729, 62 L.Ed.2d 728 (1980) (citation omitted) ("[T]he sufficiency of an indictment 'may not be properly challenged by a pretrial motion on the ground that it is not supported by adequate evidence.' "). District courts have specifically applied this

principle to RICO conspiracy indictments. *Persico,* 621 F.Supp. at 857; *Boffa,* 513 F.Supp. at 473. However, as the defense points out, some courts have undertaken pretrial scrutiny of the indictment either to assist the court in controlling the case or to prevent the prejudicial effect of misjoinder of a RICO conspiracy count. *See Castellano,* 610 F.Supp. at 1397 ("[L]imited [pretrial] review enables a court to protect persons from the enormous burdens and risks of a major trial, without significantly or improperly limiting the government's right to prosecute."); *United States v. Gallo,* No. 86–452 (Tr. 27) ("I can't rule on these things without, ... getting an analysis of what your theory is, what you plan to prove and what you're going to use to prove it."). *But see United States v. Donsky,* 825 F.2d 746, 751–52 (3d Cir.1987) (footnote omitted) ("We do not, however, believe that the district court's decision in this case, which required proof delineating what the government intended to prove at trial as to each of the various defendants, was proper."). The court is sensitive to the concerns that fueled the pretrial scrutiny of the indictment in the above noted cases. However, the court finds that a pretrial proffer or hearing would be premature. In the event that the government's case is insufficient as to the proper allegations and proof of a single RICO conspiracy or involvement of a particular defendant, the court will entertain appropriate motions at the conclusion of the government's case. Defendants' motion is denied.

## C. Defendants' Joint Motion for a James Hearing

■ Defendants also seek a *James* hearing in order to ascertain if statements of co-conspirators (Fed.R.Evid. 801(d)(2)(E)) are admissible.

A co-conspirator statement may be admitted under Fed.R.Evid. 801(d)(2)(E) if it meets three conditions: (1) there must be independent evidence establishing the existence of the conspiracy and connecting the declarant and defendant to it; (2) the statement must have been made in furtherance of the conspiracy; and (3) it

must have been made in the course of the conspiracy.

*United States v. Ammar,* 714 F.2d 238, 245 (3d Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983) (citation omitted).

A pretrial hearing to establish such a foundation for a co-conspirator statement is a matter within the trial court's discretion. *Id.* at 246. The third circuit, under certain circumstances, has allowed such statements to be admitted subject to the government making the required showing before the close of its case. *United States v. Continental Group, Inc.,* 603 F.2d 444, 456–57 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). The *Continental* court found that such a procedure should be used sparingly due to the danger of prejudice, but that its application was particularly appropriate in multi-defendant conspiracy cases. *Id.* This court will follow the procedures outlined in *Continental.* To the extent feasible, the government will be required to make the *Ammar* showing prior to submission of such statements. However, in limited circumstances, the court will allow for the admission of co-conspirator statements pending a final threshold determination of conspiracy by the court before sending the case to the jury. *See e.g. Ammar,* 714 F.2d at 247. Defendants' motion is denied.

### D. Defendants' Joint Motion for Pretrial Hearings on Evidentiary Material (Prior Conduct, Prior Convictions, Bad Acts)

█ Defendants seek an order requiring that the government disclose the evidentiary material it will use at trial under Fed.R.Evid. 403, 404(b), 608, 609(e). The question presented by the motion calls for the balancing of the prejudicial effect of the evidence against the probative value of the evidence of prior conduct, prior convictions, or bad acts. *Luce v. United States,* 469 U.S. 38, 41, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984). Such balancing is most effectively done at trial when such evidence can be evaluated in the factual context of the government's case and the defense put forward. *Id.* at 41, 105 S.Ct. at

463. This court will deal with these issues outside of the presence of the jury as they arise. It would be unduly speculative to try to resolve them without developing the factual context of the case. *See generally United States v. Bianco,* 419 F.Supp. 507, 508 (E.D.Pa.1976), *aff'd mem.* 547 F.2d 1164 (3d Cir.1977). The joint motion of the defendants and all individual motions for pretrial evidentiary hearings are denied.

### E. Defendants' Joint Motion for Pretrial Discovery (Witness List, Statements of Non-Testifying Witnesses, Grand Jury Information)

█ Defendants have made a broad motion for various types of information to be disclosed by the government. Some of these requests have been treated above, (i.e. prior conduct, prior convictions, bad acts). Specifically, the defendants seek production of a witness list, statements of non-testifying witnesses, and grand jury information. The government is obligated to disclose information under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); and the Jencks Act, 18 U.S.C. § 3500. No evidence has been brought before the court that the government is not meeting or will not meet these continuing obligations. With regard to the specific requests for a witness list and statements of non-testifying witnesses; neither is required to be disclosed as *Brady* material. *See United States v. DiPasquale,* 740 F.2d 1282, 1294 (3d Cir.1984), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985) (witness list); *United States v. Fischbach and Moore, Inc.,* 576 F.Supp. 1384, 1390 (W.D.Pa.1983) (recorded statements of alleged co-conspirators); *United States v. Kenny,* 462 F.2d 1205, 1212 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972) (witness statements discoverable under Jencks Act). The defense seeks disclosure of the identity of confidential informants. No specific need for disclosure has been demonstrated. *United States v. Jiles,* 658 F.2d 194, 197 (3d Cir.1981), *cert. denied,* 455 U.S. 923,

102 S.Ct. 1282, 71 L.Ed.2d 465 (1982). At oral argument, the defense suggested that information pertinent to John LaMonte should be disclosed now because "this is an impeachment case." The court will require that such information be released pursuant to the normal procedure of the Jencks Act in this district. This requires release in time for effective cross-examination. The government is encouraged to release such information on or before the first day of trial.

The joint defense motion and defendant Vastola individually seek disclosure of grand jury materials, or in the alternative, an *in camera* review of the grand jury minutes. There exists a long established policy of secrecy of grand jury proceedings. *See Pittsburgh Plate Glass Co. v. U.S.*, 360 U.S. 395, 399, 79 S.Ct. 1237, 1240, 3 L.Ed.2d 1323 (1959). However, the trial court can invade the secrecy of the proceedings in the interests of justice where a defendant demonstrates "a particularized need." *Id.* at 400, 79 S.Ct. at 1241. The defense request for disclosure of unauthorized persons, impanelment date, and other procedural details, is not supported by such a demonstration. A "presumption of regularity" attaches to the proceedings, and the defense has provided nothing to the court, such as reliance on perjured testimony, to disturb the secrecy. *United States v. Vaughn*, 510 F.Supp. 206, 209 (D.N.J.1981). Defendant Vastola's argument that there could be no evidence presented to the grand jury to support his indictment on narcotics charges is also without merit. This court does not know the full scope of the evidence presented to the grand jury, nor need it inquire into such evidence at this time. *United States v. Louie*, 625 F.Supp. 1327, 1342 (S.D.N.Y.1985), *appeal dismissed*, 787 F.2d 65 (2d Cir.1986) (argument that facts do not support the charges is premature). If inadequate evidence of narcotics activity exists, the narcotics counts can be challenged by a motion to dismiss. The motions to disclose or conduct *in camera* review of the grand jury materials are denied.

## F. Defendants' Joint Motion For A Bill Of Particulars

The joint defense motion seeks a 110–item bill of particulars. The purpose of a bill of particulars is "to inform the defendant of the nature of the charges against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." *United States v. Addonizio*, 451 F.2d 49, 54 (3d Cir.1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). A motion for a bill of particulars is a discretionary matter for the trial court. *Id.* Defendants' request was denied in its entirety by the government.

The defense has categorized its request into four groups: (1) information about when, where and by whom the alleged criminal acts or managerial acts relevant to the alleged enterprise were committed; (2) information about the identity of non-named participants in these acts; (3) information about uncharged overt acts or other uncharged criminal conduct which the government will seek to prove at trial; and (4) information necessary to determine whether the indictment is proper. Some of what is being sought in category (3) has already been asked for and denied in the context of other motions (e.g., prior conduct, prior convictions, bad acts). In addition, the request for information necessary to determine the adequacy of the indictment, category (4), has been denied for the most part based on other rulings made in this opinion. The court has found in large part that the indictment is adequate. Pleading of the statutory language that provides basic notice of the culpable behavior is sufficient.

Nevertheless, the court finds that defendants are entitled to more detailed information on some of the counts charged. They are entitled to "central facts," not unlimited discovery. *United States v. Johnson*, 524 F.Supp. 199, 207 (D.Del. 1981), *rev'd on other grounds*, 690 F.2d 60 (3d Cir.1982), *cert. denied*, 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 450 (1983). To the extent that the government is able to

do so, the precise date and place of each event alleged in the indictment should be provided. *United States v. Holman,* 490 F.Supp. 755, 762 (E.D.Pa.1980). In addition, the names of all co-conspirators or participants in the alleged offenses should be provided, "except insofar as the Government can show, *in camera,* that such disclosures might endanger the safety of prospective witnesses." *Id.* The government is not obligated to provide uncharged overt acts and uncharged criminal conduct. *United States v. Armocida,* 515 F.2d 29, 55 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *Johnson,* 524 F.Supp. at 207. These are not central facts to the offenses as charged. This ruling incorporates the granting of a bill of particulars as to defendants Harris and Majuri, discussed at II–F, G, of this opinion. Defendants' motion for a bill of particulars is granted in part and denied in part. Information is to be provided to the defense within 15 days of the date of the attached order; in the event that it is necessary for the government to make an *in camera* submission to the court, it shall be made within 10 days of the date of the attached order.

In conclusion, all motions for pre-trial hearings and compelled disclosure of discovery material, with the exception of the bill of particulars motion, are denied. The bill of particulars motion is granted in part and denied in part.

## V. MOTIONS TO SUPPRESS

### A. Individual Defendants' Motions To Suppress Fruits of Searches

Several defendants seek suppression of evidence under a theory that the relevant search warrants were not supported by probable cause. The review of a magistrate's probable cause determination is not *de novo,* but rather deference is to be paid to the magistrate. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). The magistrate is to consider the particular factors of each case in determining if a "substantial basis" for probable cause exists. *Id.* at 238–39, 103 S.Ct. at 2332–33. Where a defendant dem-

onstrates an inadequacy of probable cause, the appropriateness of applying the suppression mechanism must be evaluated under the requirements of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Under *Leon,* suppression is not required where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920, 104 S.Ct. at 3419. Any one of the following conditions requires suppression under *Leon:* (1) where the affiant intentionally or recklessly misleads the magistrate; (2) where the magistrate abandons his or her objective judicial role; (3) where the affidavit is so lacking in probable cause that an officer could not reasonably rely on the warrant; (4) where the warrant utterly fails to meet particularization standards. *Id.* at 923, 104 S.Ct. at 3420; *see also United States v. Savoca,* 761 F.2d 292, 298 (6th Cir.1985) (motel room search without sufficient probable cause upheld under *Leon;* "reasonably well-trained officer" could have concluded that probable cause was sufficient). Under these standards, the defendants' suppression motions challenging the search warrants and execution of such warrants are granted in part and denied in part as explained below.

### 1. Vastola Motion

Vastola challenges the probable cause finding in support of the search warrant of his home. The warrant identifies the objects of the search as follows:

Fruits and instrumentalities of the crimes of extortion and mail and wire fraud including but not limited to cash received from extortion, records of loan-sharking and extortion, and a television set obtained by mail and wire fraud.

The court will first discuss the fruits of the mail and wire fraud and then the "fruits and instrumentalities of the crimes of extortion."

### a. Fruits of Wire and Mail Fraud

█ The warrant lists only one item as a fruit or instrumentality of the mail and wire fraud: a television set. Vastola argues that Agent Mahoney made a material

misrepresentation in regard to the television set by omitting language from the intercepted Brocco-Massaro conversation that placed the television in the Vastola home. *See* Affidavit of Special Agent John Mahoney, FBI, In Support of Application For Search Warrants, ("Mahoney Affidavit"). The court has reviewed the omitted language and finds that it is not material. It does indicate that a different television set was in the Vastola home than the one described in the language provided to the magistrate. However, the additional language does not undercut or negate the inference that Vastola possessed a stolen television set in his home, nor that the set was obtained pursuant to a fraudulent scheme. Paragraphs 68, 69, 81, and 82 of the Affidavit support this inference. The court finds that the omission was neither material nor was it meant to deceive the magistrate. Therefore, defendant's request for a *Franks* hearing is denied, *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and the motion to suppress the television set is denied.

**b. Fruits of Extortion**

There is no doubt that the Affidavit supports a finding of probable cause that Vastola was involved in extortionate activity. Mahoney Affidavit at ¶ 38. The allowable inferences from the intercepted conversations in paragraph 38 are further supported by the conclusions of the affiant and by the information provided to the affiant by an informant. The affiant is an experienced FBI Agent in the investigation of organized crime activities, ¶¶ 1, 2; and thus is entitled to some deference when performing expert analysis.

> Not only must the experience of an expert affiant in examining evidence which might appear non-incriminating to a lay person be given certain deference, but: "... courts have long recognized that in the context of eavesdropping, an otherwise ambiguous conversation may serve as a predicate for probable cause so long as it is reasonably interpreted."

*U.S. v. Massino*, 605 F.Supp. 1565, 1573 (S.D.N.Y.1985), *reversed on other grounds*, 784 F.2d 153 (2d Cir.1986) (citations omitted). The affiant states that John LaMonte told him that Vastola had threatened him pursuant to the payment of monies, and that Vastola was the beneficiary of the extortion of LaMonte. ¶¶ 40, 41; *see Gates*, 462 U.S. at 237–38, 103 S.Ct. at 2331–32 (tips from informants, particularly when supplemented by independent police investigations, amount to significant information for the magistrate's probable cause determination).

Probable cause to believe that Vastola was involved in extortion does not necessarily amount to probable cause to search the home for fruits of the extortion.

> [T]he fact that there is probable cause to believe that a person has committed a crime does not automatically give the police probable cause to search his house for evidence of that crime. "If that were so, there would be no reason to distinguish search warrants from arrest warrants, and cases like *Chimel v. California*, ... would make little sense." We have consistently held that facts must exist in the affidavit which establish a nexus between the house to be searched and the evidence sought.... However, that nexus may be established either through direct observation or through normal inferences as to where the articles sought would be located.

*United States v. Freeman*, 685 F.2d 942, 949 (5th Cir.1982) (citations omitted), *see also* W.R. LaFave, Search and Seizure, § 3.1(b) at 547 & n. 34 (2d ed. 1987) ("The other side of the coin is that there may be probable cause to arrest a person for an offense involving the use of certain instrumentalities without there being probable cause to search that person's residence for them."); *id.* at 545 & n. 26 ("In the case of search warrants, the conclusions go to the connection of the items sought with crime and to their present location.") (citation omitted).

A review of the Mahoney Affidavit does not indicate a basis for a probable cause belief that fruits of the extortion could be found in the Vastola home. The government in its brief specifically identifies those paragraphs in the Affidavit

which allegedly support such a finding. Paragraph 38 contains excerpts from a wiretap implicating Vastola in the LaMonte extortion. Paragraphs 40 and 41 state that LaMonte informed Agent Mahoney that Vastola was extorting him. Paragraph 81 contains a wiretap excerpt which could support an inference that Vastola possessed a television set in his home, stolen pursuant to a mail and wire fraud scheme. Paragraph 90 describes Vastola's home with particularity. Paragraphs 6, 8, and 91 state Agent Mahoney's conclusion that Vastola is at the center of a criminal organization. Paragraphs 28, 39, and 92 state Mahoney's conclusions that Vastola is involved in extortion. Paragraphs 68 and 82 state Mahoney's conclusions that Vastola is involved in a mail and wire fraud scheme, and paragraphs 68 and 81 indicate televisions are a part of this scheme. Paragraph 93 states Agent Mahoney's conclusions that "Vastola has in his residence items obtained by mail and wire fraud." Paragraph 94 states the following:

> For these reasons, there is probable cause to believe that a search of the residence of Gaetano Vastola could result in evidence being discovered, such a cash received from extortion, records of loansharking and extortion and goods obtained by mail and wire fraud, and handwritten notes of conversations relating to the above.

Agent Mahoney's conclusion that evidence of the mail and wire fraud scheme (a stolen television) is supported by intercepted conversations. *See* Mahoney Affidavit at ¶¶ 69, 81. However, there is no support in the Affidavit for Agent Mahoney's conclusion that the home contains fruits of the extortion. The Vastola home is mentioned in three paragraphs of the Affidavit. Paragraphs 81 and 93 pertain to fruits of the mail and wire fraud. Only paragraph 94 discusses the home in relation to fruits of the extortion, and it does so in a conclusory manner. *Cf. United States v. Washington,* 797 F.2d 1461, 1472–73 (9th Cir.1986) (The fact that government failed to make any showing to the magistrate that the suspect ran an illegal business out of his home was one of three reasons cited by the

court in suppressing evidence seized from the home on the basis of an overbroad warrant.).

*Gates* teaches that conclusory statements alone cannot give rise to a probable cause finding. 462 U.S. at 239, 103 S.Ct. at 2333 ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."). While deference may be paid to an expert affiant, *United States v. Massino,* 605 F.Supp. at 1573, that deference cannot overcome a total lack of explanation of a conclusion. The evidence in the Mahoney Affidavit concerning the location of the fruits of the extortion is not ambiguous, it is totally absent.

The *Leon* standards indicate that suppression is an appropriate remedy where an officer relies on a "warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Leon,* 468 U.S. at 923, 104 S.Ct. at 3421 (citations omitted). The court finds that the conclusory statement by Agent Mahoney linking the fruits of extortion to Vastola's home, without any evidentiary support in the Affidavit, cannot serve as a basis for a reasonable belief that probable cause has been demonstrated. *Cf. Washington,* 797 F.2d at 1472–73; *United States v. Nader,* 621 F.Supp. 1076, 1084 (D.D.C.1985) (post-*Leon* case applying exclusionary rule based on failure to particularize).

Under *United States v. Christine,* 687 F.2d 749, 760–61 (3d Cir.1982), this court must determine which clauses in the warrant are supported by probable cause and which are not. This court concludes that the clause authorizing a search for "fruits and instrumentalities of the crimes of extortion ..." is invalid and the clause authorizing the search for "a television set ..." is valid. Therefore, items seized pursuant to the search for the fruits of extortion must be suppressed. *Christine,* 687 F.2d at 754 ("Materials seized under the authority of those parts of the warrant struck for invalidity must be suppressed, but the

court need not suppress materials seized pursuant to valid portions of the warrant."); *see also United States v. Gomez–Soto,* 723 F.2d 649, 654 (9th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984).

The parties have not provided relevant facts nor briefed legal arguments pertaining to the plain view and inevitable discovery doctrines. *See generally Washington,* 797 F.2d at 1468–69. To the extent they are applicable, the government is instructed to brief the issue within 10 days of this order; the defense is to respond within 20 days of this order.

### 2. Saka Motion

Saka challenges the search warrants and the underlying affidavit for his business (Video Warehouse), home, and car, on the theory that there was no particularization of the copyright fruits and instrumentalities to be seized. The challenge applies only to copyright items and not fruits of other criminal activities named in the warrants. The copyright fruits were described in slightly different terms in each warrant. The critical language in each warrant is a variation on "illegally reproduced copyrighted tapes and records...." The government argues that the warrants read in conjunction with the affidavit are sufficiently particularized. Although the challenge demands a difficult probable cause determination based on the facts of this case, the court finds the motion must be denied.

The particularization requirement is fundamental to fourth amendment law. *Washington,* 797 F.2d at 1471–72; *Savoca,* 761 F.2d at 296. "General warrants by failing to describe particularly the things to be seized, create a danger of unlimited discretion in the executing officer's determination of what is subject to seizure and a danger that items will be seized when the warrant refers to other items". *Savoca,* 761 F.2d at 299 (citation omitted). The particularity concept must be applied in the case at bar to the specific task of distinguishing illegal copyrighted tapes from legal (public domain) tapes. *Cf. Washington,* 797 F.2d at 1472, ("Thus, if items that

are illegal or fraudulent are sought, the warrant must contain some guidelines to aid the officers in deciding what may or may not be seized.") (citation omitted).

A number of courts have applied the particularization requirements in the context of a search for copyrighted records and tapes. This court finds the first circuit's approach articulated in *United States v. Klein,* 565 F.2d 183, 186–87 (1st Cir.1977), to be most instructive. *Klein* concerned the search and seizure of unauthorized reproductions of copyright tapes ("pirate" tapes), as does the case at bar. The *Klein* warrant authorized the executing officer to seize "certain 8–track electronic tapes and tape cartridges which are unauthorized pirate reproductions...." 565 F.2d at 184. The fundamental flaw identified in the warrant and affidavit was that "the warrant failed to provide any before the fact guidance to the executing officers to which tapes were pirate reproductions." *Id.* at 188. The *Klein* court also identified a failure on the part of the government to establish that there was a large collection of contraband on the defendant's premises. *Id.* Of further significance to the court, was their observation that the relevant information required could have easily been obtained and provided to the magistrate. *Id; see also United States v. Cook,* 657 F.2d 730, 734 (5th Cir. 1981) ("If a law enforcement officer has a list of the property on the premises, he can determine what is likely to be illegal or evidence of illegality, and the magistrate may easily direct seizure of that property only without unnecessarily interfering with other property of the possessor."). The *Klein* court affirmed the district court suppression of the tapes seized. *See also Montilla Records of Puerto Rico, Inc. v. Morales,* 575 F.2d 324, 327 (1st Cir.1978); *Cook,* 675 F.2d at 734. *But see E–C Tapes, Inc. v. Kelly,* 412 F.Supp. 245, 249 (N.D.Ill.1975).

The case at bar presents an extremely close question. The government clearly had evidence amounting to probable cause that Saka was involved in copyright violations while operating out of Video

Warehouse, Affidavit at ¶¶ 54, 56, 57, 59, 64, and that fruits of that activity could be found at Video Warehouse, his residence, ¶ 66, and in his car, ¶ 65. However, the warrant and the affidavit are lacking in the statement of a mechanism by which the executing officer can distinguish illegal tapes from legal tapes.

The government attempts to distinguish *Klein* on the facts, because in *Klein* reliance on experts at the scene of the search and seizure had not been demonstrated. *See Klein*, 565 F.2d at 186–87 & n. 5 ("Furthermore, there is no indication on the face of the warrant that the people executing the warrant would be experts in the field."). The government's distinction proves too much. The government argues in its brief that, "[i]n this case [the case of Saka], such an expert was referred to in the affidavit and was available at the scene to assist the seizing agents." MOL of United States in Opposition 135. However, even if the mere presence of an expert was presumed to be an adequate showing of a mechanism to differentiate legal from illegal tapes, the Affidavit does not in fact support the assertion that such an expert was to be on the scene. No representation to that effect was made to the magistrate who issued the warrant. The reference in the Affidavit to the expert is silent as to his intended role in the search, or his ability to differentiate legal from illegal tapes. *See* ¶ 65. The court does not disagree with the government's after the fact explanation that a list detailing every tape to be seized was unnecessary, nor that a screening of the tapes at the scene was impractical due to the volume seized. However, these explanations do not substitute for a showing of particularization that must be made to the magistrate. *See Klein*, 565 F.2d at 186 & n. 4 ("It is of course, rudimentary that the validity of the warrant must be appraised by the facts revealed to the magistrate and not those later found to exist by executing officers.") (citation omitted).

Review by the district court is not *de novo*, *Gates*, 462 U.S. at 235, 103 S.Ct. at 2330; if it were, this court has little doubt that it would find the government failed to meet its particularization requirement. In

the role of a reviewing court, this court finds that the affidavit does provide sufficient information to support a probable cause inference that the illegal copyright items constituted a "dominant" element of the tape inventory. *See United States v. Cortellesso*, 601 F.2d 28, 32 (1st Cir.1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980) (applying the *Klein* standards to a search for stolen goods, clothing items identified as "men's suits, sports jackets, women's boots, leather coats, fur coats ...," holding that particularization requirements change in a context where there is evidence of "a large collection of stolen goods [obtained] through a facade of legitimacy.") (citation omitted). The *Cortellesso* court ruled that a generic class of items to be seized was acceptable, because the magistrate was not required to speculate as to whether the executing officers could make the necessary distinctions. *Id.* at 32 ("There was a great likelihood that the goods to be seized would be indeed stolen.") (citation omitted).

In the case at bar, the magistrate was presented with sufficient evidence to support an inference that Video Warehouse was, in fact, an operation engaging in a range of criminal activities with a front of legitimacy. The warrant and Affidavit address at least five types of criminal activity. The specific evidence on copyright violations demonstrate a large scale video duplicating enterprise, ¶¶ 53, 54 ("300–400 machines, VCR's and discussed running 100 slaves from one master"). There was adequate evidence to suggest (1) that the enterprise was involved in illegal duplication, ¶¶ 54, 56, 57, 59, 64; (2) that four illegally copyrighted tapes were identified by name, ¶¶ 57, 59; and (3) that 13 other tapes were illegally duplicated (supported by undercover surveillance and expert investigation), ¶¶ 64, 65. Taking all these elements in combination, the Affidavit provided a reasonable basis for the seizure of all videotape instrumentalities on the premises. This court is instructed to review the warrant "in a common sense and realistic fashion." *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–46, 13

L.Ed.2d 684 (1965). Although the specific factual predicate for the copyright section of the warrant is poorly developed, and there is no doubt that the government could have reasonably provided the magistrate with more specific information, this court finds on balance that there was no violation. Defendant's motion to suppress is denied.

### 3. Majuri Motion

 Majuri seeks suppression of two firearms seized from his home, based on contentions that the warrant was not supported by probable cause, that the information supporting the warrant was stale, and that the search exceeded the scope of the warrant. For the reasons stated below, defendant's motion is denied. The Mahoney Affidavit contains intercepted phone conversations between Majuri and Massaro alluding to gambling activities. ¶¶ 14, 18, 21. The affiant, based on his experience, is entitled to interpret language and activities not generally familiar to a lay person for consideration by the magistrate. *United States v. Massino*, 605 F.Supp. at 1573. The affiant concluded that the intercepted conversations between Majuri and Massaro concerned a gambling operation. ¶ 22. The Affidavit also established a link between Majuri's gambling activities and his home. Each gambling conversation noted above was made to Majuri at a phone listed to Joan Majuri at the street address which was searched. The Affidavit also describes additional intercepted conversations between Massaro and others indicating that Massaro was involved in illegal gambling. ¶¶ 10, 12, 16, 24, 25. Finally, Agent Mahoney stated that a confidential informant, with a track record of reliability, had provided gambling information on Majuri as late as September 23, 1985. This information supports a finding that evidence of illegal gambling activities could be found at Majuri's home.

Majuri also challenges the warrant on the basis of staleness. The Affidavit was filed with the magistrate on October 7, 1985, and the warrant issued October 16, 1985. The information obtained by electronic surveillance was intercepted over a two-month period from December, 1984, to January, 1985. ¶¶ 14, 18, 21, 26. Although this information tends to support a continuing pattern of criminal activity, it alone would not support a warrant issued some ten months later. *See United States v. Johnson*, 461 F.2d 285, 287 (10th Cir.1972). However, the affiant stated that he received confidential information as late as September 23, 1985, that Majuri was involved in illegal gambling. It is not clear from the Affidavit to what time period the confidential information pertained. However, this tip amounts to a showing upon which the magistrate was entitled to base a probable cause finding because it was rendered by a reliable informant and supported by information obtained in the wiretap during the December, 1984—January, 1985 period.

Finally, Majuri challenges the scope of the search. He alleges that the guns were seized in the basement, an area of the house controlled by Carmella Majuri, not the defendant Charles Majuri. The warrant did not specify sections within the house, and could reasonably be read to cover the whole house. The officer who was involved in the search has stated that he was aware that Majuri was a convicted felon. Affidavit of William Eichhorn, July 16, 1987. This information need not have been presented to the magistrate, since the guns were seized when spotted in plain view while executing a valid search for gambling instrumentalities. *See generally Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983). Because the searching officer was aware that Majuri was a convicted felon, possession of firearms is evidence of criminal activity. Furthermore, Majuri's argument that the basement was outside an area of his control is without merit. Even if accepted as true, the argument fails because Majuri would be without standing to bring it. *See generally Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980) (defendant had no legitimate expectation of privacy as to the property that was searched). In conclusion, Majuri's motion to suppress is denied.

#### 4. Brocco Motion

Brocco seeks suppression of the fruits of the search of his home on a "taint" theory based on assertions of an illegal electronic surveillance of the residence. This court finds Brocco's arguments to suppress the electronic surveillance to be without merit. *See* Part V–B–1 of this opinion. Therefore, the motion to suppress fruits of the search is denied.

### B. Defendants' Joint Motion To Suppress Electronic Surveillance

The defendants' joint electronic surveillance suppression motion challenges all of an extraordinary volume of electronic surveillance interceptions. For the reasons stated below, this court finds that the defendants' motion to suppress is granted in part and denied in part.

■■■■ This court finds that three theories of suppression are applicable in this case. Where the government's showing of probable cause rests on the bare conclusions of affiants, suppression is appropriate. *Gates*, 462 U.S. at 239, 103 S.Ct. at 2332. Where the government obtains surveillance extensions which are derived from prior orders found to be illegally authorized, suppression of the fruits of the extension is also required. *United States v. Giordano*, 416 U.S. 505, 533, 94 S.Ct. 1820, 1835, 40 L.Ed.2d 341 (1974). Where the government obtains a surveillance order based on information that is not independent of "taint," the fruits of such surveillance must be suppressed. *United States v. Plotkin*, 550 F.2d 693, 696 (1st Cir.), *cert. denied*, 434 U.S. 820, 98 S.Ct. 61, 54 L.Ed.2d 76 (1977).

### 1. The Government's Electronic Surveillance Did Not Constitute A General Search

The federal electronic surveillance statute, 18 U.S.C. § 2518 *et seq.*, balances the fourth amendment privacy rights of individuals against the interest of the government in law and order, granting law enforcement officers broad but circumscribed powers. To obtain a court order approving electronic surveillance, law enforcement officers must show probable cause to believe that conversations concerning certain offenses will be intercepted at certain locations, and show that electronic surveillance is needed to investigate these offenses. 18 U.S.C. § 2518(3). Interceptions must be limited to those ordered by the court. 18 U.S.C. § 2518(5). A surveillance order must be correctly authorized, and it must be correctly executed. The government must adequately justify the extent of intrusion that it requests, and then it must limit itself to that scope once a court approves its request.

■■■■ In this case defendants claim that electronic surveillance orders have been ordered with regard to so many persons and offenses that the government has, in effect, executed an unconstitutional general search, an "unauthorized invasion" of defendants' privacy. *Berger v. New York*, 388 U.S. 41, 58, 87 S.Ct. 1873, 1883, 18 L.Ed.2d 1040 (1967) (overturning a New York wiretap statute for permitting "indiscriminate use" of electronic surveillance). The defendants neither show that this volume of electronic surveillance violated the provisions of the statute, nor do defendants challenge the constitutionality of the statute's protection for privacy interests. *See generally Berger*, 388 U.S. 41, 87 S.Ct. 1873. Therefore, the defendants fail to marshall appropriate arguments to support their claim that an unconstitutional "general search" was executed.

■■■■ Similarly, the defendants argue that many of the individual surveillance applications lacked a substantial showing of probable cause (which the defendants gauge as "percent" probable cause). The defendants believe that a probable cause linkage should be shown between a certain percentage of individuals named in a surveillance application and a certain percentage of offenses named in the application before a valid surveillance order should issue. However, the defendants fail to demonstrate any support for this position in the statute, in the case law, or in public policy. The statute on its face requires that the identities of persons whose com-

munications are to be intercepted must be listed *if* those persons are known. 18 U.S.C. § 2518(1)(b)(iv) & (4)(a) (emphasis added). Anyone, even unidentified persons, may be monitored so long as known persons are listed. *United States v. Kahn*, 415 U.S. 143, 157, 94 S.Ct. 977, 985, 39 L.Ed.2d 225 (1974); *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir.1983), *cert. denied*, 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984). Naming persons who are expected to be intercepted, but who are not suspected of illegal activity, comports with the public policy behind the notice provision of the electronic surveillance statute, § 2518(8)(d). *United States v. Martin*, 599 F.2d 880, 885 (9th Cir.), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979). Conversations involving persons known or unknown may be monitored only for so long as is necessary to intercept conversations concerning the particular criminal activities during the period authorized for interception by the court. § 2518(5). Section 2518(3)(c) merely requires a showing of probable cause that some individual is connected to an offense in order to authorize the interception of unknown persons' communications involving that offense that originates from a particular facility. *Kahn*, 415 U.S. at 155 n. 15, 94 S.Ct. at 984 n. 15; *see also Zurcher v. Stanford Daily*, 436 U.S. 547, 558, 98 S.Ct. 1970, 1977, 56 L.Ed.2d 525 (1978) (citing *Kahn* to uphold a search warrant for a particular facility that did not name particular persons). The court again finds that the defendants' argument that these surveillances constitute a general search is without merit.

### 2. Probable Cause and the New Jersey Surveillances

### a. The November 28, 1984 Surveillance at the Massaro Residence

■ The standard of review for findings of probable cause sufficient to justify the issuance of a search warrant is the "totality of the circumstances" doctrine set forth in *Gates*. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. *Gates* softened the strict informant reliability tests previously required under the Court's opinion in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *Gates* requires merely enough corroboration of an informant's testimony through other sources in order to demonstrate some basis for the informant's reliability. *Gates*, 462 U.S. at 244, 103 S.Ct. at 2335. In the initial Massaro surveillance application, confidential informant B's information about Massaro's bookmaking activities is corroborated by confidential informant A's information, by visual surveillance, and by telephone usage patterns, all of which tend to establish B's general reliability as an informant. His description of "scam" gambling games to be held by the wiretap targets, including the involvement of loansharks, contains sufficient detail to allow the magistrate to rely on this tip. *Spinelli*, 393 U.S. at 416, 89 S.Ct. at 589. Thus, Judge Breitkopf's order authorizing electronic surveillance of communications involving gambling, usury, and theft by deception (scam gambling games), over Massaro's telephone lines was supported by adequate findings of probable cause.

### b. The December 5, 1984 Amendment, and the December 14 and 24 Extensions of the Massaro Surveillance

The affiant for the Massaro surveillance applications, Investigator Codelensky, presented a tip from informant B indicating that certain individuals were engaging in theft, i.e., the illegal duplication of videotapes ("video bootlegging"). The tip was corroborated by incidentally intercepted conversations from the Massaro surveillance (i.e. discussions concerning the duplication of wholesale quantities of videotapes for low prices to be shipped in passenger-car trunks). This information meets probable cause requirements to authorize surveillance for theft. *Gates*, 462 U.S. at 244–45, 103 S.Ct. at 2335–36.

Subsequent Massaro surveillance extensions were properly ordered. Extension applications presented information in addition to that which was sufficient in the initial order and amendment to establish probable cause for gambling, usury, theft

by deception, and theft ("video bootlegging"). *United States v. Vasquez,* 605 F.2d 1269, 1273 (2d Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979).

### c. The Union County Prosecutor's Video Warehouse Electronic Surveillance Order, Amendment, and Extensions

■ Despite the defendants' assertions that the videotape duplication business operating as the Video Warehouse was entirely legal, and could be viewed as legitimate based upon the facts presented by the electronic surveillance applications, this court accepts Judge Breitkopt's determination that probable cause supported his December 12, 1984 order authorizing electronic surveillance to investigate theft ("video bootlegging") at Video Warehouse. As previously discussed for the Massaro residence surveillance, informant B's tip corroborated by other evidence suggestive of that illegal activity is sufficient to support a finding of probable cause, even if "innocent" explanations for surveillance targets' activities can be imagined. *Gates,* 462 U.S. at 243 & n. 13, 103 S.Ct. at 2335 & n. 13.

The December 20, 1984 amendment, and December 31, 1984 and January 11, 1985 extensions are similarly supported by findings of probable cause. A magistrate considering the informant's tips (as discussed in part 2(a) above), and relevant interceptions over the Massaro wiretap, could conclude that there was probable cause that conversations concerning gambling and theft would be intercepted through electronic surveillance at the Video Warehouse during this period. *Id.* at 230, 103 S.Ct. at 2328.

### d. The New Surveillance at Video Warehouse, Amendment and Extensions

■ Defendants suggest that the January 24, 1985 application for a new Video Warehouse surveillance order was misleading because it included conclusions not supported by the facts presented. It is the issuing court's conclusions, however, not the applicant's conclusions, that are subject to review. The issuing judge need not endorse all of the applicant's conclusions in order to find sufficient probable cause to authorize a surveillance. *Armocida,* 515 F.2d at 41 (affiant's "conclusion" is not a "fact" which can be tested for misrepresentation). Based upon the totality of credible factual information offered in this application, this court finds that electronic surveillance to investigate bribery and corrupt influence, theft, and usury was properly authorized.

■ There was sufficient information in the January 24, 1985 application concerning financial connections and apparent undue influence between various individuals awarding and bidding for government construction contracts to arrive at a finding of probable cause to believe that bribery and corrupt influence were taking place. In particular, information in the application suggests that (1) James Kehoe was project manager for the government's Earl Naval Weapons Station construction project (Criminal Action Application Pursuant to N.J.S. 2A:156A–9 at ¶ 31 (January 24, 1985)) ("January 24 Application"); (2) Kehoe was providing "inside" information to assist certain other surveillance targets' attempts to obtain Earl Naval Weapons Station construction contracts, in exchange for a percentage of the proceeds (January 24 Application at ¶ 19); (3) Kehoe provided his only set of plans for at least one construction project for surveillance targets' use (January 24 Application at ¶ 31). From this information a magistrate could find probable cause to properly authorize interception of conversations concerning bribery and corrupt influence.

Information suggesting loansharking activity in prior affidavits, combined with the February 6, 1985 conversation between Massaro and Kehoe (Criminal Action Application for Extension and Amended Orders Pursuant to N.J.S. 2A:156A–9/N.J.S. 2A:156A–12 (February 13, 1985)), which strongly suggests a usurious loan, establishes probable cause for interception of conversations concerning usury pursuant to the February 13 amendment and extension of the new Video Warehouse order.

■ The sufficiency of a showing of probable cause under New Jersey law for a new "order to intercept a communication of a person or on a facility which was the subject of a previous order" ("repeat order"), N.J.Stat.Ann. § 2A:156–10(f), as distinguished from "a renewal or extension" of a previous order, id., appears to be a matter of first impression for this court. A showing of probable cause sufficient for a repeat order must be "based upon new evidence or information different from and in addition to the evidence or information offered to support the prior order." Id. In the instant application, the only "new" probable cause information which had not been incorporated in the applications for the prior Video Warehouse order and its extensions is explicitly concerned with the bribery and corrupt influence offenses. Additional information concerning gambling, conspiracy, and usury, is incorporated by reference to the Majuri and Killeen electronic surveillance applications.

The defense argues that the January 24 application has not met the statutory requirement that probable cause information in addition to that used to support the original order must be presented in order to repeat surveillance after two extensions have been granted. However, on its face, the § 2A:156–10(f) requirement to present probable cause information different from that "offered to support the prior order" can be satisfied with information incorporated by reference to applications for extensions to the prior order. The applications for the December 20, 1984 amendment, and December 31, 1984, and January 11, 1985 extensions to the original Video Warehouse order, incorporated by reference in the January 25, 1985 renewal application, do contain "information different from and in addition to" that found in the application for the original order. This information includes interceptions pursuant to the order itself. The statute clearly differentiates between an application for an order and an application for renewal or extension of an order. N.J.Stat.Ann §§ 2A:156A–9(d), 2A:156A–10(f); Vasquez, 605 F.2d at 1277 (New Jersey "set[s] the standards for issuance of a 20–day order

higher than those governing issuance of a 10–day extension.") (footnote omitted). This court holds, therefore, that additional probable cause could be found, for the new order to authorize interception of conversations concerning the offense of theft, based upon "new" information incorporated by reference to the prior extension applications. Such information satisfies the requirement that a greater showing of probable cause than that originally offered be presented in order to obtain a new order. Id.

Pursuant to N.J.Stat.Ann. § 2A:156A–12(f), law enforcement officers properly instructed their monitors to sharply reduce eavesdropping of theft conversations to those minimally necessary to fulfill their newly stated objective of merely tracking developments regarding video duplication activities. New Jersey v. Catania, 85 N.J. 418, 434, 427 A.2d 537, 545 (1981) ("police must make reasonable efforts to minimize intrinsically [through monitoring] as well as extrinsically"); cf. United States v. Harvey, 560 F.Supp. 1040, 1058 (S.D.Fla.1982), aff'd, 789 F.2d 1492 (11th Cir.), cert. denied, —— U.S. ——, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986) (continuing electronic surveillance is permitted for the purpose of determining "the scope of the conspiracy and the identity of the individuals involved") (citing United States v. McCoy, 539 F.2d 1050, 1056 (5th Cir.1976), cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977)).

Extensions with regard to theft, bribery and corrupt influence, and usury, were also properly granted pursuant to 18 U.S.C. § 2518(1)(f) and N.J.Stat.Ann. 2A:156A–9(d) upon reporting the results of the ongoing surveillance in the extension applications.

### e. The Brocco Residence Surveillance

Information from applications for the Massaro and Video Warehouse applications, incorporated by reference into the Brocco application, establish ample probable cause to believe that conversations concerning theft and bribery and corrupt influence would be intercepted over Brocco's telephone lines for the reasons stated in

detail in part 2(e) above. Additional information presented in the Brocco application reinforces this finding. It is noted that a magistrate could find probable cause to intercept conversations regarding video bootlegging despite the likelihood that legitimate tape duplicating was also taking place.

Extensions of the Brocco surveillance were supported by the findings of probable cause in the initial order, supplemented by the results thus far obtained from the surveillance, which were properly reported in the extension applications pursuant to 18 U.S.C. § 2518(1)(f) and N.J.Stat.Ann. 2A:156A–9(d). Thus, the extensions were properly granted.

### f. The Killeen and Majuri Residences Surveillance

Visual and electronic surveillance evidence reported to support these applications is somewhat ambiguous. However, considering the totality of circumstances, including the incorporation by reference of the Massaro and Video Warehouse applications that this court has reviewed and approved (part 2(e) above), a substantial basis was established for a finding of probable cause to intercept conversations concerning the offenses of conspiracy and promoting gambling at both locations, and usury at the Killeen residence.

### g. The March 14, 1985 Federal Video Warehouse Surveillance

The affidavit for the March 14, 1985 order authorizing electronic surveillance at Video Warehouse demonstrates a plausible organization connecting a number of the surveillance targets to a number of offenses. The issuing magistrate could find that probable cause supports the government's belief that a racketeering organization was operating from the Video Warehouse.

Probable cause for narcotics interceptions was established by an informant's tip corroborated by evidence of surveillance targets' activities which might otherwise seem "innocent" of wrongdoing. *Gates*, 462 U.S. at 243 & n. 13, 103 S.Ct. at 2335 & n. 13. Probable cause for mail and wire fraud (construction bid rigging) was estab-

lished in the same manner as has been discussed for the Union County Video Warehouse surveillance (bribery and corrupt influence), discussed herein at part 2(e). Probable cause for all of the elements of 18 U.S.C. § 892, extortionate extensions of credit, including legally unenforceable credit transactions, usurious interest rates, reputation for the use of extortionate means (criminal convictions), and credit exceeding $100, was shown through an informant's tip, corroborated by previous interceptions and other information.

The government has demonstrated that named targets of this surveillance had conducted gambling activities continuously between September, 1984 and January 3, 1985. This court notes that this gambling activity was of a sufficiently "protracted and continuous nature" such that there was probable cause for the interception of gambling conversations as of March 14, 1985. *Tehfe*, 722 F.2d at 1119.

### h. The April 16, Video Warehouse Order

The April 16 Video Warehouse extension properly ordered surveillance for extortion, gambling, narcotics, and wire fraud/mail fraud (construction contracts). The March 14 Video Warehouse application, incorporated by reference into the April 16 application, established probable cause for these offenses. The April 16 application reports the results thus far obtained by the ongoing surveillance, without significant bias, pursuant to 18 U.S.C. § 2518(1)(f). The court reserves opinion on the suppression of interceptions pertaining to theft from interstate shipment and wire fraud/mail fraud with regard to illegal tape duplication ("videoduplicating"), pending further argument scheduled for September 8, 1987.

### i. The May 14 Video Warehouse Order

Ample probable cause for interception of conversations concerning narcotics, gambling, extortion, and wire fraud/mail fraud (construction), has been established by incorporation of prior applications and presentation of subsequent interceptions. Ample probable cause also existed for the interceptions of conversations concerning

Western Union Access codes. The April 16 Affidavit (Extension) provides indicia of wrongdoing adequate to support a probable cause finding as to Western Union fraud. Agent Dossett described specific telephone conversations from Video Warehouse where Massaro, Sr. and Massaro, Jr. discussed Stone's attempt to combine access numbers to find a new code. ¶ 57. Paragraph 56 provides evidence of codes being used that do not work. The May 14, 1985 Affidavit (Second Extension) includes further evidence of a pattern of trying out different access numbers. Such evidence provides the substantial basis to the judicial officer for uncovering evidence of wrongdoing that is required by *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331.

The court reserves opinion on suppression of surveillances of theft from interstate shipment, and mail/wire fraud (video duplicating and "bust-out") pending further argument.

### j. The June 26 Video Warehouse Order

The government's investigation of narcotics, gambling, extortion, wire fraud/mail (construction contracts) and Western Union fraud at the relocated Video Warehouse operation is essentially identical to that at the previous location. These may be considered ongoing activities involving the same participants. Probable cause to intercept conversations concerning these activities has been amply established by the preceding federal Video Warehouse applications (incorporated by reference) and supplemented by later interceptions. The court reserves opinion on the suppression of interceptions pertaining to wire/mail fraud (video duplicating and "bust-out") and theft from interstate shipment, pending further argument.

### k. The July 25 Video Warehouse Order

The court reserves opinion on the suppression of interceptions pertaining to theft from interstate shipment, and mail/wire fraud (video bootlegging and "bust-out") pending further argument. Defendants' motion to suppress is denied with respect to all other interceptions.

### 3. Defendants' Request For A Franks Hearing

The defendants have not demonstrated inaccuracies, omissions, or misrepresentations, in the electronic surveillance applications which could be regarded as necessary to the issuance of any of the surveillance orders. Thus, defendants are not entitled to a *Franks* hearing to test the validity of any of the surveillance orders. *Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85.

### 4. Failure to Exhaust Ordinary Investigative Means

Defendants claim that, in several instances, the government failed to meet its obligation to demonstrate that it had exhausted ordinary means of investigation before requesting electronic surveillance. 18 U.S.C. § 2518(3)(c). This claim is without merit. The government is not required to attempt every possible alternative means short of electronic surveillance, but merely to show what has been tried and to state its estimation of the probable success of other methods. *See Armocida*, 515 F.2d at 38 ("To support a finding that normal investigative procedures are unlikely to be successful, [2518(3)(c) only requires] a factual predicate in the affidavit."). In particular, the defendants argue that the government should have questioned those persons engaging in transactions with surveillance targets in order to determine if these activities were legal. Such a course would not only be unlikely to provide significant information about the details behind these activities, but would also be likely to expose the ongoing investigation. Here, the defendants' argument is not pertinent to a proper showing of alternative investigatory means so much as it is a criticism of the government's showing of probable cause to believe that the defendants' activities were illegal.

The surveillance targets were engaged in elaborate transactions which did not appear within plain view. A "sting" operation would not have been as likely to provide information about the identities of all of the persons involved in various activities

and the scope of their involvement. A magistrate could have found that electronic surveillance was needed to investigate the extent of these activities. Additional information about the extent to which LaMonte was providing or willing to provide personal information regarding the surveillance targets and their activities would not have affected this finding. The government's electronic surveillance applications put forward sufficient detail about the pursuit of alternative investigative means to convince a magistrate that electronic surveillance was needed to pursue legitimate investigatory goals. *Gates,* 462 U.S. at 236, 103 S.Ct. at 2331.

### 5. Delay in Sealing the Fruits of the March 25, 1985 Video Warehouse Order

■ The government admits that the tape recordings of interceptions pursuant to the March 25, 1985, Video Warehouse surveillance were not sealed until July 15, 1985, but claims that this violation of the statutory requirement that tapes be sealed immediately following "the conclusion of one continuous period of surveillance," *Persico,* 621 F.Supp. at 865, does not mandate suppression. "[F]ailure to seal the tapes promptly is not such a violation that requires suppression as a matter of law.... The crucial factor, however, is the integrity of the tapes themselves." *United States v. Falcone,* 505 F.2d 478, 484 (3d Cir.1974). In *Falcone,* the trial court held an evidentiary hearing to determine the integrity of the tapes. Where the integrity of the tapes is not in dispute, "a delay in sealing the tapes is not, in and of itself, sufficient reason to suppress the evidence obtained therefrom." *Id.* In the case at bar, the integrity of the tapes has not been questioned, and thus suppression is not mandated. Similarly, the delay in sealing two reels of tape until August 19, 1986, caused by clerical error, does not require suppression.

### 6. The Maryland Surveillance Orders

#### a. The March 19 Surveillance Order

■ The March 19 Maryland surveillance order properly authorized the interception of conversations regarding wire

fraud and extortion. Contrary to the defendants' attempt to demonstrate governmental misrepresentations in the electronic surveillance applications concerning surveillance targets' narcotics activities, the presentation or omission of probable cause information regarding narcotics, which is named as an offense in the succeeding surveillance order but not in the March 19 order, is irrelevant to the appropriateness of surveillance regarding wire fraud and extortion. This is not a subterfuge search, *United States v. McKinnon,* 721 F.2d 19, 23 & n. 2 (1st Cir.1983), but a surveillance order based upon a substantial basis for probable cause to believe that conversations concerning wire fraud and extortion would be intercepted over the designated telephone lines. The applications' discussion of suspected narcotics activities is therefore irrelevant to the validity of this order.

The precision and attention to detail displayed in the government's showing of exhaustion of ordinary investigatory means, without significant misrepresentation with regard to the offenses to be surveilled, tends to support the applicant's claim that electronic surveillance was needed to further the government's investigation.

#### b. The April 23, 1985 Extension of the Maryland Surveillance

■ When conversations are electronically monitored which clearly relate to illegal activities, law enforcement officers may intercept these conversations and subsequently apply for judicial authorization to intercept them, pursuant to 18 U.S.C. § 2517(5). Incidental interception of narcotics conversations pursuant to the original surveillance order was permissible because the original March 19 surveillance was not a "subterfuge search." *McKinnon,* 721 F.2d at 23 & n. 2; *accord, United States v. Gambale,* 610 F.Supp. 1515, 1528 (D.Mass.1985). Law enforcement officers' clear indication in the original application that they expected to intercept narcotics conversations pursuant to that order, although they lacked probable cause to intercept, suggests candor rather than subterfuge. Authorization to intercept narcotics conversations was properly sought after these conversations began to be intercept-

ed. *United States v. Masciarelli,* 558 F.2d 1064, 1067–68 (2d Cir.1977); *accord United States v. Gerena,* 653 F.Supp. 974, 982 (D.Conn.1987). A substantial showing of the need for electronic surveillance to investigate the scope of narcotics activities was also supplied. *United States v. Tufaro,* 593 F.Supp. 476, 491 (S.D.N.Y.1983), *aff'd,* 762 F.2d 991 (2d Cir.), *cert. denied,* 474 U.S. 826, 106 S.Ct. 84, 88 L.Ed.2d 69 (1985); *United States v. Baynes,* 400 F.Supp. 285, 299–300 (E.D.Pa.1975).

**7. New York Federal Surveillance**

■ Defendants argue that the omission of detail in the Roulette Records surveillance application concerning John La-Monte's willingness to cooperate with the government investigation, particularly his willingness to provide consensual recordings, mandates suppression of the fruits of that surveillance. This court holds that suppression is not required. The issuing magistrate's finding that alternative investigatory means were not available would not have been affected by the knowledge that LaMonte was willing to make consensual recordings. *See United States v. Ippolito,* 774 F.2d 1482, 1486–87 (9th Cir. 1985). Such recordings would be no more likely than LaMonte's own testimony to reveal the scope of the alleged extortionate operation's activities outside of LaMonte's personal knowledge. It was reasonable for the magistrate to conclude that conversations to be intercepted between alleged participants would yield evidence relevant to the extortion of LaMonte, information not otherwise made available by calling La-Monte as a cooperating witness or by simply recording LaMonte's conversations with alleged participants. In this respect, the defendants' motion to suppress is denied.

■ Defendants also argue that the omission of reference to prior Union County surveillance orders in the application for the Roulette Records surveillance mandates suppression pursuant to the requirement of 18 U.S.C. § 2518(1)(e) that "all previous applications known to the individual authorizing and making the application ... involving any of the same persons, facilities, or places specified in the [subse-

quent] application" must be identified in the subsequent application. However, if the omission is unintentional, suppression is not required. *United States v. Van Horn,* 789 F.2d 1492, 1500 (11th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986). Here, the defendants fail to show that this omission was intentional or reckless. Along with Special Agent Ferreira's supplemental affidavit, affirming his lack of knowledge concerning the Union County prosecutor's electronic surveillance at that time, M.O.L. Of The United States In Opposition To Joint Motion Of Defendants To Suppress The Fruits Of Electronic Surveillances, Exhibit 3, the fact that the New York federal application meticulously cites a number of other prior electronic surveillances, including the federal Video Warehouse surveillance, suggests that the omission was unintentional. Accordingly, suppression is not required.

■ Defendants further argue that the quantity of simultaneous wiretaps authorized in the New York federal investigation precludes the possibility of a valid showing of exhaustion of alternative investigatory methods pursuant to § 2518(3)(c) for at least some of these wiretaps. They argue that at least some of the wiretaps are redundant because of the likelihood that many conversations could be simultaneously intercepted over two wiretapped telephones when surveillance targets spoke to one another. In arguing redundancy, however, the defendants neglect to give sufficient consideration to the likelihood that significant conversations might be intercepted over these wiretaps that did not originate from any of the other wiretapped telephones. For each wiretap, probable cause and the need for electronic surveillance were properly demonstrated. Suppression is not warranted.

**8. Defendants' Request for Orders and Applications for Surveillances at the Olympia Esposito Residence, the Smith Street Democratic Club, and Manhattan Social Clubs**

**a. The Olympia Esposito Residence 10–Day Reports**

The government has agreed to provide the defendants with 10–day reports from

the original Esposito surveillance that were incorporated by reference into the application for extension of the Esposito order. Letter from Bruce Repetto, Assistant United States Attorney, to Judge Stanley S. Brotman (August 12, 1987). It appears that this request is now moot.

### b. The Democratic Club Applications and Orders

 Defendants are not entitled to orders and applications relating to electronic surveillance at the Smith Street Democratic club because no defendant has standing to challenge those orders. It is undisputed that no defendant was named in these orders or intercepted pursuant to these orders. M.O.L. In Opposition (Electronic Surveillance) at 151, Exhibit 3. Therefore, the orders and applications need not be disclosed pursuant to § 2518(9). *Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969).

### c. The Manhattan Social Clubs Applications and Orders

 Defendants are not entitled to orders and applications relating to electronic surveillance at two Manhattan social clubs. According to the representation of the government, which has not been disputed, no interceptions were obtained pursuant to these orders. Thus, defendants have not demonstrated their standing as "aggrieved persons" able to suppress these surveillances because they were intercepted, and no representation has been made that they own the premises that were surveilled. *United States v. Lanese*, 385 F.Supp. 525, 527 (N.D.Oh.1974) (citing 18 U.S.C. §§ 2510(11), 2518(10)(a)); *cf. United States v. Torres*, 583 F.Supp. 86, 96 (N.D.Ill.1984), *rev'd on other grounds*, 751 F.2d 875 (7th Cir.1984) ("Only defendants who are overheard in an earlier interception are 'aggrieved persons' entitled to assert that a later interception was tainted by an earlier one."). Defendants' request for these materials is denied.

In summary, the court reserves on the defendants' motion to suppress electronic surveillance interceptions as it pertains to theft from interstate shipment (orders dated April 16, 1985, May 14, 1985, June 26, 1985, July 25, 1985), mail fraud/wire fraud—video duplicating (orders dated April 16, 1985, May 14, 1985, June 26, 1985, July 25, 1985), and mail fraud/wire fraud—"bust-out" (orders dated May 14, 1985, June 26, 1985, July 25, 1985); the motion is denied as to all other interceptions.

An appropriate order will be entered.

### ORDER

This matter having been brought before the court on motions of defendants; and

The court having reviewed the submissions and oral argument of the parties; and

For the reasons expressed in this court's opinion filed this date,

IT IS on this 1st day of September, 1987, hereby

ORDERED:

1. All motions by defendants to dismiss counts of the indictment are DENIED.

2. All motions by defendants to require the government to elect between offenses charged in individual counts, or to elect between counts, are DENIED.

3. Defendants' joint motion to strike surplusage from the indictment is GRANTED IN PART and DENIED IN PART.

4. Defendants' joint motion and individual motions to sever are GRANTED IN PART and DENIED IN PART; the matter is severed into seven separate trials; see Part III–A of the attached opinion.

5. The dates for the five trials involving the eleven non-RICO defendants commence on October 13, 1987; the dates for the two trials of the ten RICO defendants commence on March 7, 1988. Counsel are to appear on September 8, 1987 at 9:30 a.m., in order to discuss the order of trials; following the hearing, the court will issue a supplemental order listing trial dates and a schedule for pre-trial motions.

6. All motions to adjourn the trial dates are DENIED.

7. The motion of defendants Levy and Fisher to compel discovery is DENIED; the government is ordered to review the

New York wiretap information, as described in the attached opinion, and to file the two requested reports with the court within fifteen (15) days of the date of this order.

8. Defendants' joint motion and individual motions for a bill of particulars are GRANTED IN PART and DENIED IN PART; any required *in camera* submissions by the government to be made within twenty (20) days of the date of this Order.

9. All other defense motions for pretrial hearings and discovery (proffer of single conspiracy); *James* hearing; evidentiary material (prior conduct, prior convictions, bad acts); and pretrial discovery (witness list, statements of nontestifying witnesses, grand jury information), are DENIED.

10. Defendant Vastola's motion to suppress the fruits of the search of his home is GRANTED IN PART and DENIED IN PART.

11. The motions to suppress fruits of a search, filed by defendants Brocco, Majuri, and Saka, are DENIED.

12. The court RESERVES decision on defendants' motion to suppress interceptions pertaining to theft from interstate shipment (orders dated April 16, 1985, May 14, 1985, June 26, 1985, July 25, 1985), mail/wire fraud—illegal tape duplication (orders dated April 16, 1985, May 14, 1985, June 26, 1985, July 25, 1985), mail/wire fraud—"bust-out" (orders dated May 14, 1985, June 26, 1985, July 25, 1985); counsel are hereby ORDERED to appear on September 8, 1987 at 9:30 a.m. for further argument as to suppression of the above noted interceptions; defendants' motion to suppress as to all other interceptions is DENIED.

13. Defendants' joint and individual motions for leave to file further pretrial motions is GRANTED only to the extent that such motions are necessitated by the relief provided by this order. A schedule will appear in a supplemental order subsequent to the September 8, 1987 hearing.